STATE OF CONNECTICUT *v.* DANIEL DIAZ
(AC 28177)

DiPentima, Harper and Berdon, Js.

520

Argued March 18—officially released August 5, 2008

*Mark Diamond*, special public defender, for the appellant (defendant).

*Nancy L. Chupak*, assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Mary Rose Palmese*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Daniel Diaz, appeals from the judgments of conviction, rendered after a jury trial, of possession of narcotics with the intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), two counts of possession

of narcotics in violation of General Statutes § 21a-279 (a) and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1).[1] The defendant claims that (1) the evidence did not support his conviction with regard to two of the charges, (2) the court and the prosecutor violated his constitutional rights by commenting on matters that were not in evidence, (3) the court improperly excluded certain evidence and (4) the court improperly denied his motion to suppress. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. In early 2001, the defendant was under investigation by the New Britain police department for illegal drug related activities. On March 13, 2001, New Britain police officers arrested Kevin Lockery, who was known by the police as a drug user, for a narcotics offense. In an effort to gain lenient treatment, Lockery identified the defendant as a drug dealer and provided the police with information about the defendant. At the direction of the police, Lockery called the defendant on a cellular telephone and arranged to purchase five bags of heroin at a specific location in New Britain. Shortly after the defendant received Lockery's call, the defendant left his residence and drove to that location. Lockery did not meet the defendant as arranged, and, after several minutes, the defendant began to drive away.

Police officers stopped the defendant's automobile. A search of the defendant yielded twenty-five packets of heroin, $1025 and a cellular telephone that displayed

---

[1] The jury found the defendant not guilty of one count of possession of narcotics with the intent to sell by a person who is not drug-dependent. As a result of the defendant's conviction on the remaining four counts, the court imposed a total effective sentence of twenty-five years imprisonment.

Previously, the defendant had been convicted, following a jury trial, of all of the charges underlying this appeal. Our Supreme Court reversed that judgment; *State* v. *Diaz*, 274 Conn. 818, 878 A.2d 1078 (2005); and the present appeal follows the new trial that was ordered on remand by our Supreme Court.

among received calls the telephone number from which Lockery had called the defendant to arrange the drug purchase. A subsequent search of the defendant's residence, pursuant to a warrant, yielded 168 packets of heroin, sixteen grams of marijuana, a twelve gauge shotgun, several shotgun shells and numerous other items typically used in the sale and distribution of illegal drugs. Additional facts will be set forth as necessary.

## I

The defendant's first claim is that the evidence did not support his conviction of possession of the narcotics seized from his residence and of criminal possession of a firearm.[2] We disagree.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

[2] At the close of the state's case-in-chief, the defendant moved for a judgment of acquittal with regard to all counts of the state's case. The court denied the motion.

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Silva*, 285 Conn. 447, 454, 939 A.2d 581 (2008).

We now turn to the specific counts at issue, which related to the heroin and firearm seized from the defendant's residence. General Statutes § 21a-279 (a) provides in relevant part that "[a]ny person who possesses or has under his control any quantity of any narcotic substance" is subject to the criminal penalties set forth therein. In a substitute long form information, the state alleged in count four that "on or about March 14, 2001, in the area of 207 Beaver Street in the [c]ity of New Britain, the [defendant] did possess narcotics, to wit: heroin . . . ." At trial, the defendant admitted that he had access to the residence but denied that he possessed or had under his control the heroin or firearm seized by the police.

"Pursuant to our rules of law, § 21a-279 (a) requires that the state . . . establish beyond a reasonable doubt that the accused *knew* of the character of the drug and its presence and exercised dominion and control over

it. . . . Where . . . the contraband is not found on the defendant's person, the state must proceed on the alternate theory of constructive possession, that is, possession without direct physical contact. . . . Where the defendant is not in exclusive possession of the [place] where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference. . . . Further, to convict the defendant of this crime, the state had to prove that the defendant, and not some other person, possessed a substance that was of narcotic character with *knowledge* both of its narcotic character and the fact that he possessed it." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Gooden*, 89 Conn. App. 307, 315–16, 873 A.2d 243, cert. denied, 275 Conn. 918, 919, 883 A.2d 1249 (2005).

General Statutes § 53a-217 (a) provides in relevant part: "A person is guilty of criminal possession of a firearm . . . when such person possesses a firearm . . . and (1) has been convicted of a felony . . . ." In count five of the state's substitute long form information, the state alleged that "on or about March 14, 2001, in the area of 207 Beaver Street in the [c]ity of New Britain, the [defendant] did possess a firearm, to wit: one Mossberg model # 590 [twelve] gauge [shotgun], and said [defendant] was previously convicted of a felony . . . ."

"Possess," as defined in General Statutes § 53a-3 (2), "means to have physical possession or otherwise to exercise dominion or control over tangible property . . . ." "The essence of exercising control is not the manifestation of an act of control but instead it is the act of being in a position of control coupled with the

requisite mental intent. In our criminal statutes involving possession, this control must be exercised intentionally and with knowledge of the character of the controlled object." *State* v. *Hill*, 201 Conn. 505, 516, 523 A.2d 1252 (1986). To prove that the defendant constructively possessed the firearm, it was the state's burden to prove that he "knowingly [had] the power and the intention at a given time of exercising dominion and control over [the firearm]." (Internal quotation marks omitted.) Id., 513. When, as here, the doctrine of nonexclusive possession also is implicated,[3] the state bears the burden of proving that there were "incriminating statements or circumstances"; (internal quotation marks omitted) *State* v. *Williams*, 258 Conn. 1, 7, 778 A.2d 186 (2001) (discussing application of nonexclusive possession doctrine in prosecution under § 53a-217 [a] [1]); other than the discovery of the firearm in the residence he shared with his girlfriend, tending to buttress the inference that he knew of the firearm's presence and had control over it.

The defendant does not claim that the evidence did not demonstrate that the police seized 168 packets of heroin and a firearm upon executing a search warrant at his residence on March 14, 2001. The essential element that is common to both counts at issue, and which the defendant challenges on appeal, relates to possession. Specifically, the defendant claims that the evidence was insufficient to prove that he constructively

---

[3] "The doctrine of nonexclusive possession was designed to prevent a jury from inferring a defendant's possession of [an illegal item] solely from the defendant's nonexclusive possession of the premises where the [illegal item was] found. . . . When the doctrine applies, an instruction [concerning the doctrine] focuses the jury's attention on the defendant's knowledge and intent to possess, precluding it from inferring possession from the mere fact that the defendant, along with others, occupied or had access to the premises wherein the contraband was found." (Citation omitted; internal quotation marks omitted.) *State* v. *Williams*, 258 Conn. 1, 7–8, 778 A.2d 186 (2001).

possessed either the heroin or the firearm found at his residence because (1) he was not present in the residence at the time those items were seized, (2) he was not in exclusive possession of the residence, and (3) he presented testimony from Michele Gross, his girlfriend with whom he shared the residence at the time of the seizure, that the heroin and firearm belonged to Gross' friend, Renee Johnson, who was at the residence at the time those items were seized by the police.

The defendant's arguments are unavailing. The jury had before it ample evidence from which it could infer that the defendant was a drug seller and that his apartment was integral to that criminal enterprise. The state presented evidence that prior to the defendant's arrest, a confidential informant had provided information to the police that the defendant was a heroin dealer. Police surveillance, both at the defendant's apartment and earlier at the residence of the defendant's mother, revealed conduct consistent with the sale of illegal drugs.

The state presented evidence that on the date of his arrest, the defendant left his apartment after receiving Lockery's telephone call and drove directly to the location where Lockery had agreed to purchase heroin from him. Incident to a patdown search, the police discovered that the defendant had hidden in his buttocks twenty-five bags of heroin. Each packet had been stamped or labeled in red ink with what an officer described as a "smiley face" insignia. The police also discovered $1025 and a cellular telephone that displayed the telephone number from which Lockery had arranged the heroin purchase.[4]

When the police executed a search warrant at the defendant's apartment, they discovered 168 packets of heroin that were packaged and marked in a manner

[4] In part IV, we address the defendant's claims concerning the legality of the search of his person and his residence.

identical to those found on the defendant. The drugs were found in a dresser drawer in a bedroom located in the rear of the apartment. In the bedroom, the police also found marijuana as well as a scale and packaging items that, as testimony revealed, were of the type commonly used in the sale and distribution of illegal drugs. In a nightstand near a bed, the police found six twelve gauge shotgun shells. In a closet near the front door to the apartment, the police found an operable twelve gauge shotgun. A police expert in the firearms field testified that the assault variety of shotgun shells found in the apartment commonly were used by SWAT teams and could immediately subdue human targets. The officer drew a connection between the defendant's sale of drugs and possession of the firearm, opining that the firearm had been used by the defendant to "defend himself, his home, his family and his drugs and the proceeds from the sale thereof." The state also presented evidence that in the bedroom, the police found a copy of the lease to the apartment, in the defendant's and Gross' names, as well as bank receipts in the defendant's name. The police also observed that the mailbox at the residence listed the defendant's name as well as that of Gross.

This evidence, viewed as a whole, amply supported a finding that the defendant had known of the character and presence of the heroin found in his residence and that he had exercised dominion and control over the heroin. Also, it was entirely reasonable for the jury to view the firearm in conjunction with the ample evidence of the defendant's drug related activities and the large quantity of heroin that was stored in the residence and conclude that it was in his possession and integral to his criminal activities. There were ample incriminating circumstances, apart from the location from which the contraband was seized, to support a finding of constructive possession.

It is not persuasive that the defendant was not present in the apartment at the time of the search or that he was not in exclusive possession of the apartment. The defendant also relies on Gross' testimony, which was that the heroin and firearm belonged to Johnson, who died prior to trial. Certainly, the jury was free to accept as true Gross' testimony and, thus, find that the defendant did not constructively possess the heroin or firearm. In construing the evidence in an effort to support the jury's verdict, however, we must conclude that the jury, as was its prerogative, did not look favorably on Gross' testimony. See *State* v. *Wells*, 100 Conn. App. 337, 342, 917 A.2d 1008 (noting this court's deference to jury's credibility determinations), cert. denied, 282 Conn. 919, 925 A.2d 1102 (2007). For all of these reasons, we reject the defendant's claim.

## II

The defendant next claims that both the court and the prosecutor violated his constitutional rights[5] by commenting on matters that were not in evidence. We disagree.

The following events underlie both aspects of the defendant's claim. During the state's case-in-chief, the prosecutor elicited testimony from Jerry Chrostowski, one of the police officers who participated in the investigation and the defendant's arrest. Chrostowski testified about the circumstances surrounding the arrest and, specifically, that police seized $1025 from the defendant incident to a patdown search. Chrostowski discussed

---

[5] Although the defendant refers to his rights to a fair trial and to a jury trial under the federal and state constitutions, he has not provided a separate analysis of this claim under the state constitution or asserted, as relevant to this claim or otherwise, that the state constitution affords him greater constitutional safeguards than its federal counterpart. Accordingly, we will confine our review to the rights afforded by the federal constitution. See generally *State* v. *Ortiz*, 280 Conn. 686, 689 n.2, 911 A.2d 1055 (2006); *State* v. *Nash*, 278 Conn. 620, 623 n.4, 899 A.2d 1 (2006).

police procedures for recording and storing evidence and testified that those procedures were followed in this case. Absent objection, the state introduced as a full exhibit a bag used by police to store items seized from the defendant and the contents of that bag, which consisted of a cellular telephone and a set of keys. The prosecutor then asked Chrostowski to explain one of the notations that appeared on the evidence bag. The following colloquy between the prosecutor and Chrostowski then occurred:

"Q. Could you read that [notation on the bag] please?

"A. Per asset forfeiture judgment, $1025 given to Detective [Daniel] McAloon on September 27, 2002, for compliance.

"Q. Okay. What does asset forfeiture mean?

"A. It's a tool used. When money is seized from suspected drug dealers, the money is taken through asset forfeiture and percentages are given back to the police department. Percentages go toward drug education and so forth.

"Q. All right. So, is it—could that be an explanation as to where the money is?

"A. Correct.

"Q. All right. Because the money was previously in that envelope?

"A. Yes, ma'am."

Later, during cross-examination of Chrostowski, the following colloquy between the defendant's attorney and Chrostowski occurred:

"Q. And you've testified in a number of trials, correct?

"A. Correct, sir.

"Q. Okay. You also said that you seized over $1000 in cash?

"A. Yes, sir.

"Q. Okay. But that cash wasn't here today?

"A. No, sir.

"Q. And, again, you've testified in a number of trials. Is that odd that the cash isn't here today?"

Following an objection, the defendant's attorney rephrased the question, asking: "[H]ave you ever testified at a trial where the state hadn't produced money that was seized?" The prosecutor objected, and the court addressed the objection outside of the jury's presence. The defendant's attorney claimed that the line of inquiry was proper, stating: "[T]he state has a burden, under the best evidence rule, to put forth the best evidence. Now, whether or not [the prosecutor's] office is responsible for this money being seized and disposed of in an in rem hearing is, I think, beside the point. I think it's the state of Connecticut versus [the defendant]. The state of Connecticut is responsible for this. [The defendant is being] prosecuted by the office of the state's attorney and, even though the state's attorney had no fault in this money disappearing, the state of Connecticut did." The prosecutor responded that the inquiry improperly suggested that the office of the state's attorney was somehow at fault, that it had lost the seized cash. Upon inquiry by the court, the prosecutor represented that following an earlier proceeding, the cash had been the subject of "an asset forfeiture" by order of the court. The prosecutor stated that this action had occurred against her expressed wishes and that it "shouldn't have happened." The defendant's attorney expressed his concern that there was no way for the jury to determine whether the currency at issue was real or counterfeit.

The court asked the defendant's attorney to specify what he wanted to ask Chrostowski concerning the cash. The defendant's attorney stated: "I don't think it's an unfair question to ask a seasoned police officer whether it's odd not to have proceeds .. . . from the supposed drug dealer present at a trial." The court questioned whether any response to this question was relevant to the issues before the jury. The defendant's attorney argued that he was not alleging any type of misconduct on the state's part but expressed that the jury had a right to examine the cash. He stated: "I think I have the right to point out [to the jury] that the state would have liked to have produced [the cash] but didn't, and whatever they draw from that they draw from that. I don't make arguments with regard to negative inferences."

The court stated: "[W]e're all in agreement that the money . . . was forfeited pursuant to the asset forfeiture law pursuant to an order of a Superior Court judge, which was not sought. That order was not sought by the police, nor was it sought by the state. In fact, if I understand it correctly, the state's attorney specifically noted, at an earlier proceeding, that the money should not be destroyed or should not be diverted to the asset forfeiture." The court also stated: "I don't think . . . it's fair to leave . . . in the minds of the jury the possible conclusion that something wrongfully occurred here either because of misconduct by the police or misconduct by the state's attorney. Now, if you are going to be asking questions about why the money isn't here, I think the state is going to argue that it's entitled to bring out the fact that there was a previous trial and the defendant was convicted."[6]

After the court raised the subject of the defendant's prior trial, during which the cash was presented by

---

[6] See footnote 1 of this opinion.

the state, the defendant's attorney represented that the defendant was willing to raise the subject of the earlier trial before the jury. The court stated: "I'm not going to inject an issue like a prior conviction and reversal and whatever other issues are going to arise from that. I'm not going to inject that in this case. If you intend to bring out or argue that the money isn't here, I'm going to give the jury some type of instruction which tells them that the money—in a previous legal proceeding, the money was forfeited in an asset forfeiture. That's already before the jury based on the note on [the evidence bag presented by the state]. And there was no misconduct by any party. But the money will not be in the courtroom today." The defendant's attorney responded, "Okay."

The defendant's attorney reiterated that he did not want to raise the issue of any wrongdoing by the office of the state's attorney. He stated: "I truly believe [that] if the state's attorney's office had been in possession of the money, it would be here today. . . . That was my only comment with regard to this, Your Honor. And whatever language Your Honor instructs . . . the jury, we'll have to be comfortable with."

The court stated that it would "propose some language" and then stated: "What I will instruct the jury is to this effect: In prior legal proceedings, the $1025 at issue here was ordered forfeited by the court in an asset forfeiture program. Although this forfeiture action means that the actual money, the bills themselves, will not be available in these proceedings here, you are hereby instructed that the forfeiture was conducted in accordance with law, and no party, not the state nor the defendant nor the New Britain police department acted inappropriately or engaged in any misconduct. You will be able to argue what you claim is your point to the jury, that they can't feel, see and have this money in their hands, which is [what] you tell me is the reason

that you think the questioning is appropriate. And I'm telling them they will not have the bills." The defendant's attorney immediately replied, "Yes, sir." The court then continued, "So, you can argue your point, but I think in this way the jury also knows that any other inference which they might be inclined to draw is not appropriate." The defendant's attorney replied, "I'm more concerned with making that statement on closing arguments." The defendant's attorney did not object to the court's ruling or its proposed instruction to the jury.

The court then summoned the jury to the courtroom and instructed the jury as follows: "Before the cross-examination continues, I just want to give you an instruction with regard to the $1025, which the witness testified about during direct and cross-examination. And the questions that were asked just prior to the break concerning the fact that that sum of money is not in the evidence bag [in] which the witness testified it was placed. In this regard, you're instructed as follows: in prior legal proceedings, the $1025 had been ordered forfeited by the court to an asset forfeiture program. Although the forfeiture action means that the actual money itself, that is, the bills themselves, are not available in these proceedings to be placed into evidence, you are hereby instructed that the forfeiture action was conducted in accordance with law. And no party, not the state's attorney nor the defendant nor the New Britain police department acted inappropriately or engaged in any misconduct whatsoever." The defendant's attorney did not object to the court's instruction to the jury and, thereafter, continued his cross-examination of Chrostowski.

During closing argument, the prosecutor made the following comments: "Now, just before I even forget this, it was mentioned that there was $1025 found on [the defendant's] person. That was not presented to

you here in court, and if you can please remember an instruction or information that the court gave you regarding the $1025 that that was the subject of a prior legal proceeding, before we were here, and it went to a program called the asset forfeiture program [and] that a judge had ordered that. If that judge had not ordered that money to the asset forfeiture fund, I would have had it in court here to show you." The defendant's attorney did not object to this argument either at the time it was made or at the conclusion of the state's closing arguments.

## A

The defendant claims that the court violated his constitutional rights when it instructed the jury as it did concerning the cash. The defendant argues: "It is the jury and not the court that is the arbiter of the facts. . . . Had the court properly let the jury decide whether the evidence was legitimately missing or did not exist in the first place, or whether it was illegitimately missing, the jury could reasonably have concluded that the cash was not recovered from [him]. . . . Had the issue of the missing cash been properly left to the jury to decide as a factual matter, it could . . . have concluded that [he] was not a drug dealer because he did not have a large amount of cash when arrested." The defendant acknowledges that his trial counsel did not object to the court's instruction and seeks review of this claim under the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

The state argues that *Golding* review is inappropriate because the defendant's trial counsel agreed in substance with the court's instruction. Specifically, the state relies on counsel's statements that the cash had been forfeited through no fault of the office of the state's attorney and that the defendant did not want to raise any issue of misconduct concerning the cash. The state

argues that the defendant's claim is at odds with the position that he took at trial and, thus, that he waived any objection to the instruction. The relevant inquiry, however, is not limited to whether the defendant's attorney agreed in substance with the court's instruction. Resolving the reviewability issue raised by the state also requires that we determine whether the defendant's attorney waived any objection to the court's delivering the instruction to the jury.

Our review of the extended colloquy between the court, the defendant's attorney and the prosecutor reveals that the defendant's attorney plainly expressed his understanding that the cash, which had been present at the defendant's earlier trial, had been the subject of a forfeiture and that this had occurred through no fault of the prosecutor or the office of the state's attorney. The defendant's attorney indicated that he wanted the jury's attention drawn to the fact that the cash was not available for the jury's review. During the course of the discussion and once the court ruled that it would not permit the defense to present evidence related to the prior trial or the proceeding related to the forfeiture of the cash, the court indicated that it would formulate an instruction to address the defendant's concern. The court read aloud its proposed instruction and afforded the defendant's attorney and the prosecutor an opportunity to voice any objections. Neither party voiced any concerns, and the defendant's attorney affirmatively expressed his consent to the court's proposed instruction. Thereafter, the court delivered the instruction absent objection.

This is not a situation in which counsel merely failed to object to a ruling. The court engaged in a dialogue with counsel as to how to resolve the issue raised by the defendant's attorney, thereby inviting the parties to express any concerns as to its proposed resolution of

the issue. The defendant's counsel, acting on the defendant's behalf, had an immediate duty to object to the court's proposed instruction if he deemed it improper. See *State* v. *Stewart*, 64 Conn. App. 340, 352, 780 A.2d 209 (discussing role of defense counsel), cert. denied, 258 Conn. 909, 782 A.2d 1250 (2001). Under these circumstances, by failing to object and by responding affirmatively when the court read aloud its proposed instruction, the defendant's attorney indicated his agreement with the court's decision to instruct the jury as it did. By acquiescing in the ruling, the defendant has waived any claim that the court's instruction was improper. It is fundamentally unfair to both the state and the court, as well inconsistent with the position he took at trial, for the defendant to raise this claim on appeal. See, e.g., *State* v. *Pierce*, 269 Conn. 442, 452, 849 A.2d 375 (2004) (holding that party's conduct represented acquiescence to court's rulings and constituted waiver of claim on appeal); *State* v. *Kelly*, 106 Conn. App. 414, 428, 942 A.2d 440 (2008) (same); *State* v. *Munoz*, 104 Conn. App. 85, 88 n.4, 932 A.2d 443 (2007) (same). The defendant's recourse to *Golding* review, therefore, is unavailing; the claim fails under *Golding's* third prong. See *State* v. *Brewer*, 283 Conn. 352, 360, 927 A.2d 825 (2007) (" 'unpreserved, waived claims, fail under the third prong of *Golding*' "); *State* v. *Fabricatore*, 281 Conn. 469, 482, 915 A.2d 872 (2007) (same); *State* v. *Browne*, 84 Conn. App. 351, 383 n.22, 854 A.2d 13 ("Our appellate courts frequently have stated that a party may not pursue one course of action at trial for tactical reasons and later on appeal argue that the path he rejected should now be open to him. . . . *Golding* is not intended to give an appellant a second bite at the apple." [Citation omitted; internal quotation marks omitted.]), cert. denied, 271 Conn. 931, 859 A.2d 930 (2004).

## B

The defendant also claims that prosecutorial impropriety of constitutional magnitude occurred during closing argument when the prosecutor referred to the court's instruction concerning the disposition of the cash found on the defendant and commented that had the cash not been forfeited, she would have presented it as evidence. The defendant claims: "[T]he prosecutor made herself a witness and personally vouched for alleged facts not in evidence by telling the jury that had a judge not . . . transferred the cash to the asset forfeiture program (an alleged fact that was not in evidence), she would have brought the cash to court to show the jury (also an alleged fact not in evidence)." The defendant acknowledges that he did not object to the prosecutor's comments. Although unpreserved, the claim is nonetheless reviewable. See *State* v. *Fauci*, 282 Conn. 23, 33, 917 A.2d 978 (2007).

"In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial." (Citation omitted.) *State* v. *Bell*, 283 Conn. 748, 760, 931 A.2d 198 (2007).

"[A] prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . . A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . The fifth amendment's guarantee of due process encompasses the requirement that a conviction be supported by sufficient proof. Due

process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. . . . [O]ne accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." (Citations omitted; internal quotation marks omitted.) *State* v. *John B.*, 102 Conn. App. 453, 463–64, 925 A.2d 1235, cert. denied, 284 Conn. 906, 931 A.2d 267 (2007).

In reviewing the prosecutor's comments, we recall the evidence presented by the state concerning the discovery of the $1025 and the subsequent forfeiture of the cash after it was in police custody. We also recall the court's specific instruction to the jury concerning the cash and the circumstances surrounding its absence from the trial. On the basis of this information before the jury, we conclude that the prosecutor's comments fell within the realm of fair argument. We know of no authority, and the defendant does not bring any to our attention, that forbids a prosecutor from referring in argument to a court's instruction concerning the evidence. The prosecutor's comment that she would have presented the cash in evidence if it had not been forfeited was fairly related to the evidence and the reasonable inferences to be drawn from it. Accordingly, we are not persuaded that the comments were improper.

III

The defendant next claims that the court improperly excluded from evidence a letter written by Lockery.[7] We disagree.

[7] The defendant also claims that the court's ruling deprived him of his right to a fair trial under the federal and state constitutions. We decline to review this separate claim. At trial, the defendant objected to the court's ruling solely on evidentiary grounds and has not argued, under *Golding* or

Outside of the presence of the jury, the defendant's attorney made an offer of proof with regard to a letter that the defense asserted was written by Lockery. The handwritten letter stated:

"To whom it may concern

"I Kevin Lockery am writing this statement on my own free will due to the fact am scared of the New Britain police and I know for a fact that there is a innocent man in jail. Daniel Diaz did not sell me drugs. The police Jerry told me that if I went along with his plan to take BB[8] of[f] the streets, he would help me and give me dope. Officer Jerry gave me dope and I did se[e] the police in [possession] of heroin before they even went to arrest BB it was the same heroin that was in the trial. The bags were stam[p]ed with a smil[e]y face. Every time I received dope from Jerry it was the same bags stamped with a smile. BB was [introduced] to me by a mutual friend and not of any drugs deals am scared and fear for my life and my family's life not by BB but by the same people who are suppose to protect me as a citizen. I testified in court against Daniel Diaz BB because the police said I had no choice and they gave me heroin.

"Am doing this by my own free will."

At the top of the letter appears the date March 15, 2002. At the conclusion of the letter appears the signature of "Kevin Lockery" in two places. Under these signatures appears the signature of "Andrew Pirog, N.P.," next to the date March 18, 2002. The date "1-31-2006" appears immediately beneath Pirog's signature, and a raised notarial seal appears near the signatures.

otherwise, that he is entitled to extraordinary review of an unpreserved constitutional claim. See *State* v. *Longo*, 106 Conn. App. 701, 709, 943 A.2d 488 (2008) (appellate court will not engage in level of review not requested).

[8] Evidence was presented earlier in the trial that the defendant was known by the alias B.B. and that Chrostowski's first name is Jerry.

The defense called Pirog to testify in an attempt to authenticate the writing. Pirog testified that he was a notary public in good standing. Pirog testified that his signature appeared on the letter followed by the date his commission expired, January 31, 2006. Pirog did not recall any of the circumstances surrounding his notarizing the letter, whether it had been written in his presence or the person or persons who had presented it to him to be notarized. He testified, however, that it was his practice in notarizing documents to require a person or persons appearing before him to present identification, typically a valid Connecticut operator's license, and to sign in his presence the document to be notarized. Pirog testified that the area where Lockery's signature appeared, immediately above Pirog's signature on a handwritten line, was the area "where the individual who showed [him] identification signed the paper."

The defendant's attorney argued that through the letter and Pirog's testimony, he had authenticated the letter. The defendant's attorney argued that the letter fell within an exception to the hearsay rule because it was a statement against penal interest by Lockery. Specifically, the defendant's attorney argued that the letter was written by Lockery shortly after the defendant's first trial concluded in early 2002 and that Lockery revealed in the letter that he had committed perjury when he testified against the defendant at that trial. To demonstrate that Lockery was unavailable, the defendant's attorney represented that he did not have a last known address for Lockery, that the New Britain police department actively was looking for Lockery to serve an outstanding warrant on him for failure to appear and that Lockery was "not in the department of correction." He further represented that Lockery was nomadic and that he could not hire an investigator to search

for Lockery without having a starting point for such a search.

With regard to the trustworthiness of the statement, the defendant's attorney argued that it was demonstrated by the fact that Lockery made disparaging statements concerning the New Britain police department that were against his penal interest. He argued: "[Lockery] made the statement to a person in New Britain and, at the time the statement was made, [the defendant] was incarcerated. He was making a statement against the New Britain police department, and he gave that statement to [the defendant's] family, knowing that [it] was going to be published. . . . And, again, for somebody . . . who is at least . . . a passive participant in the drug trade of New Britain, you can't expect him to throw the New Britain police department under the bus casually. He knows that once this gets out, he's never going to be able to get deals like he did before. There's no way around that. And by giving [it] to my client's family, he knows this . . . is going somewhere." The defendant's attorney argued that Lockery's statement was corroborated by the fact that his testimony in the defendant's first trial was inconsistent with that of the police officers who testified at the first trial and at the present trial. Additionally, the defendant's attorney argued that there was a difference between the heroin found on the defendant's person and that found in his residence.

The prosecutor objected to the admissibility of the letter on grounds of both authentication and the hearsay rule. With regard to the latter ground, she argued that the statement was not against Lockery's penal interest, that Lockery's testimony in the first trial did not differ in any material respects from that of the police officers who testified, that the statement was not corroborated

in any relevant manner so as to demonstrate its trustworthiness and that the defense had not demonstrated, in the first instance, that Lockery was unavailable.

The court ruled that the statement was inadmissible on several grounds. The court concluded that the defendant had not satisfied his burden of authenticating the letter. The court also ruled, regardless of the authentication issue, that the letter violated the rule against hearsay. First, the court concluded that counsel's representations concerning Lockery's unavailability did not constitute sufficient proof that Lockery was, in fact, unavailable. Second, the court concluded that the letter did not constitute a statement against Lockery's penal interest because none of the statements therein tended to subject Lockery to criminal liability for any crimes but were in the nature of a recantation of Lockery's prior testimony. Third, the court concluded that there had not been a sufficient showing that the statement was trustworthy. In this regard, the court commented that the statement was made approximately one year following the criminal conduct at issue. The court also deemed it noteworthy that it did not have any information as to the circumstances surrounding the making of the statement, such as why the declarant made the statement, whether he wrote it himself, whether he brought it to be notarized on his own and for what party did the declarant make the statement. The court also noted that the two signatures on the letter, purporting to be those of Lockery, differed in their appearance. The court further reasoned that a statement that exculpated an accused person was especially suspect and that the defendant had not presented any evidence to corroborate the statements at issue.

The defendant now challenges every aspect of the court's ruling in an effort to persuade this court that the letter was authenticated properly and that it constituted a statement against penal interest and, thus, fell

under an exception to the hearsay rule. Leaving aside the authentication issue, we conclude that the court properly determined that the letter did not fall within the hearsay exception relied on by the defendant.

"To the extent a trial court's admission of evidence is based on an interpretation of the [Connecticut] Code of Evidence, [a reviewing court's] standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. They require determinations about which reasonable minds may not differ; there is no 'judgment call' by the trial court, and the trial court has no discretion to admit hearsay in the absence of a provision providing for its admissibility. . . .

"We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . In other words, only after a trial court has made the legal determination that a particular statement is or is not hearsay, or is subject to a hearsay exception, is it vested with the discretion to admit or to bar the evidence based upon relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought." (Citations omitted.) *State v. Saucier*, 283 Conn. 207, 218–19, 926 A.2d 633 (2007).

The parties do not dispute that the letter constituted hearsay; see Conn. Code Evid. § 8-1 (3); and was inadmissible unless otherwise proven admissible by an applicable rule of law. See Conn. Code Evid. § 8-2. Section 8-6 of the Connecticut Code of Evidence provides that if the declarant is unavailable as a witness, a statement against penal interest is not excluded by the hearsay rule. Section 8-6 (4) of the Connecticut Code of Evidence defines a "statement against penal interest" as

follows: "A trustworthy statement against penal interest that, at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest."

As a preliminary matter, we address the issue of whether the defendant met his burden, as the proponent of the evidence, of demonstrating that Lockery was unavailable. "[O]ur Supreme Court [has] recognized five of the most common situations in which a declarant will be deemed unavailable to testify. The situation most relevant to the present case is one in which the declarant is absent from the hearing and the proponent of his statement has been unable to procure his attendance . . . *by process or other reasonable means*. . . . In interpreting reasonable means, [our Supreme Court has] held that the proponent must exercise due diligence and, at a minimum, make a good faith effort to procure the declarant's attendance. . . . The trial court has broad discretion in determining whether the proponent has shown a declarant to be unavailable. Only upon a showing of a clear abuse of discretion will this court set aside on appeal rulings on evidentiary matters. . . . [I]t is within the discretion of the trial court to accept or to reject the proponent's representations regarding the unavailability of a declarant and the trial court's ruling will generally not be disturbed unless the court has abused its discretion. . . .

"[D]ue diligence to procure the attendance of the absent witness [is] . . . an essential . . . predicate of unavailability. . . . To take advantage of the hearsay

exceptions requiring unavailability, the proponent must show a good faith, genuine effort to procure the declarant's attendance by process or other reasonable means. . . . This showing necessarily requires substantial diligence. In determining whether the proponent of the declaration has satisfied this burden of making reasonable efforts, the court must consider what steps were taken to secure the presence of the witness and the timing of efforts to procure the declarant's attendance. . . . A proponent's burden is to demonstrate a diligent and reasonable effort, not to do everything conceivable, to secure the witness' presence." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Wright,* 107 Conn. App. 85, 89–90, 943 A.2d 1159, cert. denied, 287 Conn. 914, 950 A.2d 1291 (2008).

The defendant's attorney made representations concerning his efforts to locate Lockery. On the basis of these representations, the court reasonably could conclude that the defendant's attorney had made some efforts to locate Lockery but that these efforts were limited to speaking with the police, conducting some investigation of state prison records and making inquiries, to an unknown extent, at the defendant's last known address.[9] There is no basis in evidence to refute the court's determination that these efforts were not sufficiently exhaustive. The defendant's attorney did not state how much time he spent in those efforts, who, if anyone, he spoke with concerning the defendant or who, if anyone, he spoke with about the feasibility or availability of other means to locate Lockery. He did not present any evidence concerning his efforts or evidence to support a finding that any additional efforts

---

[9] It is also noteworthy that the prosecutor, in response to the representations of the defendant's attorney, represented that the New Britain police were not searching actively for Lockery because the outstanding warrant was not deemed a high priority. Additionally, the prosecutor represented that although Lockery had eluded police capture, New Britain police, in fact, had recently observed Lockery in New Britain on several occasions.

were futile. On this record, we conclude that the court's determination that the defendant had not made a genuine and good faith effort to procure Lockery's attendance reflected a sound exercise of discretion. Compare *State* v. *Wright*, supra, 107 Conn. App. 90–92 (holding that evidence concerning efforts made to locate witness reflected due diligence).

We also will address whether the court properly determined that the statement was not trustworthy. The court stated that the timing of the statement, approximately one year after the defendant's arrest and two months following the defendant's first trial, weighed against its trustworthiness. "In general, declarations made soon after the crime suggest more reliability than those made after a lapse of time where a declarant has a more ample opportunity for reflection and contrivance." (Internal quotation marks omitted.) *State* v. *Lopez*, 254 Conn. 309, 317, 757 A.2d 542 (2000). The court properly deemed it significant that the defendant had not presented any evidence concerning the person to whom the statement was made. See *State* v. *Pierre*, 277 Conn. 42, 70, 890 A.2d 474 (noting that relationship between declarant and person to whom statement made significant consideration in evaluating trustworthiness), cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006); *State* v. *Rivera*, 268 Conn. 351, 369–70, 844 A.2d 191 (2004) (same); *State* v. *Bryant*, 202 Conn. 676, 699, 523 A.2d 451 (1987) (noting that "[a]cknowledgement of criminal activity is generally made only to confidants or to persons in whom the declarant imposes trust" [internal quotation marks omitted]).

Also, the court relied on its determination that the defense had not presented any persuasive evidence to corroborate the statements. Contrary to the arguments of the defendant's attorney, the statements do not constitute Lockery's admission of any specific crime but,

rather, portray the police as wrongdoers and the defendant, generally, as an innocent man. Most importantly, however, having presented no evidence concerning the circumstances surrounding the making of the statements at issue, the defendant faced an almost insurmountable hurdle in attempting to demonstrate that the statement was trustworthy. "[Our Supreme Court] has held that, it is not necessary that the trial court find that all of the factors support the trustworthiness of the statement. The trial court should consider all of the factors and determine whether the totality of the circumstances supports the trustworthiness of the statement." (Internal quotation marks omitted.) *State* v. *Camacho*, 282 Conn. 328, 358–59, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007). Having carefully reviewed the record, we conclude that the court's determination that the statement was not trustworthy reflected a sound exercise of discretion and that the court's ruling that the statement did not fall within the hearsay exception relied on by the defendant was legally correct.

## IV

Prior to the start of the trial, the defendant moved to suppress, as the fruit of unlawful seizures, the contraband seized from his person and from his residence. Following a hearing, the court denied the motion. The defendant now challenges that ruling.[10]

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence

---

[10] In his brief, the defendant refers to applicable safeguards afforded by the federal and state constitutions, yet he does not provide this court with an analysis of his claim under the state constitution. Accordingly, we will consider the defendant's claim solely under the federal constitution. See footnote 5 of this opinion.

and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Luurtsema*, 262 Conn. 179, 184, 811 A.2d 223 (2002).

A

In an oral ruling, the court set forth the following factual findings and legal conclusions concerning the search of the defendant's person. "After Mr. Lockery had been arrested for his own possession of heroin, he indicated to [Officer Christopher] Brody . . . that he . . . could order up drugs from the person he knew as B.B. Actually, according to Officer Brody's testimony, Mr. Lockery also offered to order up and provide the cooperation against the person from whom he had just recently bought the narcotics for which he has been apprehended. So, actually, Mr. Lockery offered his cooperation with regard not only to this defendant, whose nickname was B.B., but also to the person who had sold Lockery the drugs with which he had been caught . . . .

"Now, when the police heard Lockery mention . . . that he could order drugs from the person known to him as B.B., this reference to B.B. did not fall on deaf ears. The name B.B., far from being foreign to police, was known by New Britain police [as] a nickname for [the defendant], and Officer Chrostowski had been investigating [the defendant's] involvement in narcotic activities.

"In fact, [Chrostowski] had already, prior to the events of March 13, taken steps to surveil the location and had already received from other sources significant information concerning [the defendant's] narcotics involvement. Also, the police knew about Mr. Lockery

himself [as] someone who had long been involved in the drug culture more as a buyer than as a seller . . . . [Lockery] was a person that police could reasonably conclude had knowledge of drug activity and would be able to reliably inform on those who were in the business of selling narcotics.

"Now, with all that, it was agreed that Lockery would place a call to [the defendant]. Now, it's important to note that Lockery had the telephone number himself. And prior to Lockery placing the call [which was made] on a police officer's cellular telephone . . . Chrostowski set up surveillance outside the [New Britain apartment] where he knew [the defendant] resided.

"Now, Officer Brody then heard Lockery make the call on Brody's telephone. And while [the defendant's attorney] is correct that Officer Brody only heard Lockery's side of the conversation and not the other side of the conversation, he did hear . . . Lockery engage the person on the other end in a drug purchase. And as Brody listened to Lockery's side of the conversation and after the call was completed, it was clear to Brody from what he heard . . . that a drug transaction had just been set up, that it would occur in minutes [and] that [the defendant] was going to deliver the drugs to a location in a parking lot across the street from [a restaurant in New Britain]. He also knew that that was [a] location in relative[ly] close proximity to where [the defendant] lived. So, there was quite a bit of predictive information that was received by Brody from the nature of the telephone call that was made by Lockery. This information was communicated to Chrostowski, who was outside [the defendant's] apartment . . . and within minutes of Chrostowski learning that this call had been placed, Chrostowski observed [the defendant] leave his apartment alone . . . some time after 9 p.m. on March 13. He watches [the defendant] leave the apartment, get into the car—and I omitted that when

Lockery had indicated [that] he could call [the defendant], that Chrostowski went to what he knew to be [the defendant's] address . . . and confirm[ed] that the car that Chrostowski had previously [observed] in his surveillance and investigation of [the defendant] . . . was there in the parking lot.

"So, here it is nine or ten at night. The defendant comes out of his house, gets into his car and drives straight from his home, stopping nowhere until he pulls into this parking lot [across the street from a restaurant and] adjacent to a business that I don't believe was even operating. The defendant sits alone for five to ten minutes in a parking lot of . . . almost an abandoned business and then leaves after sitting there for ten minutes. Now, the police then stop the defendant a short distance away after he leaves the parking lot. The defendant . . . is alone in [his automobile]. There is a stop made with lights and sirens by the uniformed officers.

"I'm also going to mention . . . one other fact . . . that can be considered in my determination of probable cause. Even if one were to assume that there's only one reasonable suspicion to justify this stop. The police approaching the car . . . asked the defendant [where he was coming from] and he said, I'm coming from . . . Malikowski Circle, which was untrue because Officer Chrostowski had observed him coming not from Malikowski Circle, but directly and without interruption from Beaver Street. All of that information, in the court's view, the fact that all of the predictive information came true, the information the police had beforehand, in the court's view, adds up to probable cause to arrest the defendant."

Responding to arguments advanced by the defendant during the hearing, the court stated: "To the claim that Lockery may have faked that he was making a call,

[it] just doesn't add up, to me. It's not a reasonable interpretation of what took place. Lockery, by all accounts, is now in [the] custody of the New Britain police. He's trying to get consideration for himself . . . . The idea that he's going to now fake a telephone call on the police cell phone, yet, he's going to pretend this with the police sitting right opposite him . . . and then send the police on what could be a wild goose chase, it just doesn't interfere—the fact that you can come up with an innocent explanation [for the defendant's conduct] does not defeat probable cause. And . . . the idea that it just so happened that Lockery knew that the defendant's normal schedule would put him in the parking lot, it just doesn't add up, either. The idea that the defendant had a normal schedule that on certain nights he would drive his car to an abandoned parking lot, sit for ten minutes and then leave, it just doesn't mean that probable cause doesn't exist.

"With regard to the fact that [Lockery] was a first time informant, I agree. He was not a registered confidential informant. He had not previously given information to police. But the law recognizes that first time informants can be used, and the fact that they don't have a . . . track record does not mean, in and of itself, that their information can't be used." The court discussed relevant case law and observed that factors relevant to its consideration were corroboration by the police of the information provided, declarations against penal interest by the informant and the informant's reputation and prior criminal history.

The court continued: "Corroboration goes without saying. The police staked out the location. They watched [the defendant] leave his house minutes after the telephone call was made to him by Lockery. He went directly to this . . . location in the parking lot, stopping nowhere in between. I think that's the kind of corroboration that the courts are looking for and

that goes hand in hand with the fact that . . . Chrostowski had already been involved in investigating [the defendant] in the past.

"I also . . . believe that [Lockery] did make [a statement against his] penal interest. . . . [He made] statements against his penal interest in the sense that he was admitting to the police that he could order up drugs from [the defendant] or he could order up drugs from [another] seller . . . . And I think this broader view of what is a declaration against penal interest is appropriate. He is giving police information of that nature and, thereby, implicating himself in active drug dealing. He's also making a statement against penal interest in this sense. He is giving information to police, which, if police later prove was false, he could be exposed . . . to prosecution for making a false statement, interfering with police or the like." The court rejected the claim, advanced by the defense, that Lockery was untrustworthy because he provided information to police in an attempt to gain lenient treatment for his own wrongdoing. The court stated that "one who knows the police are already in a position to charge him with a serious crime will not likely undertake to divert the police down blind alleys."

The court continued: "The third factor is whether or not the police know the individual named and whether or not he could be a suspect. And, in this case, they knew the defendant . . . and knew that he had already been subject to investigation for dealing in drugs, which is another factor, which, in the court's view, proves the reliability of the information given by Lockery.

"So, the court finds that there was probable cause to arrest the defendant. Because of that, the police could make a full search incident to his arrest, and that search would have been permitted under law even if it preceded in time the instance where the defendant was

formally placed under arrest. . . . [A]s a search inci-
dent to arrest, the search can actually precede the
arrest. So, I find probable cause and, therefore, the
search [of the defendant] could be a full search and the
discovery of the drugs was [legally] appropriate.

"I will add [that] [e]ven if probable cause did not
exist to arrest the defendant, reasonable suspicion cer-
tainly did, and the police were justified in stopping the
defendant's car on reasonable suspicion and, thereafter,
the discovery of the drugs was proper [during] a valid
patdown [search] under the plain feel doctrine." The
court then addressed and rejected the defendant's
claims that (1) even if a stop of the defendant's vehicle
was legally permissible, a patdown search of the defen-
dant was not and (2) even if a patdown search was
legally permissible, the discovery of the drugs was
beyond the scope of such a valid search. The court
stated: "[U]nder these circumstances, the court finds
that even if there wasn't probable cause that justified
a full search, there was reasonable suspicion to stop
the defendant and to pat him down and [that] the drugs
were, thereafter, found appropriately during the pat-
down search." Accordingly, the court denied the motion
to suppress insofar as it was related to the heroin seized
from the defendant's person.

The defendant reiterates several arguments that he
raised before the court in advancing his claim that the
police lacked probable cause to stop his automobile.
The defendant does not challenge the court's factual
determinations. He argues, instead, that police did not
observe anything in his operation of the automobile,
which was registered to him, that gave rise to a reason-
able and articulable suspicion that there was contra-
band in the automobile. The defendant also relies on
the fact that police did not find a weapon on his person
or in the automobile. The defendant also argues that
any information provided by Lockery could not have

supported a reasonable and articulable suspicion because he was an untested informant, there was no showing that any information provided by him was reliable, there was no showing that Lockery had a sound basis for the information he provided to police and the police neither verified nor attempted to verify the information.

As set forth previously, the court concluded that the police had probable cause to arrest the defendant when the police pursued and stopped his automobile. The parties do not challenge the court's determination that the defendant was seized at that time. In their briefs, the parties have analyzed the issue in terms of whether an investigatory stop was lawful, and we will, likewise, analyze the legality of the seizure on that ground.

"[W]hen considering the validity of a . . . stop, our threshold inquiry is twofold. . . . First, we must determine at what point, if any, did the encounter between [the police officer] and the defendant constitute an investigatory stop or seizure. . . . Next, [i]f we conclude that there was such a seizure, we must then determine whether [the police officer] possessed a reasonable and articulable suspicion at the time the seizure occurred. . . .

"The federal law of search and seizure in this area is well settled. The fourth amendment to the federal constitution, made applicable to the states through the due process clause of the fourteenth amendment, provides in relevant part that [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . . Certain seizures are reasonable under the fourth amendment even in the absence of probable cause if there is a reasonable and articulable suspicion that a person has committed or is about to commit a

crime. . . . When a reasonable and articulable suspicion exists, the detaining officer may conduct an investigative stop of the suspect in order to confirm or dispel his suspicions. . . .

"In determining whether a detention is justified in a given case, a court must consider if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. When reviewing the legality of a stop, a court must examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom." (Citations omitted; internal quotation marks omitted.) *State* v. *Brown*, 279 Conn. 493, 516–17, 903 A.2d 169 (2006).

The court thoroughly considered the relevant information known to the police concerning the defendant. Its analysis of these factors was legally and logically correct and amply supported its conclusion that the police had a reasonable and articulable suspicion that the defendant was engaged in criminal activity at the time of the stop. Prior to the search, the police gathered information, both from an informant and as a result of their investigation of the defendant, concerning the defendant's drug related activities. The police also received information from Lockery that led to surveillance at the time in question. This surveillance corroborated Lockery's information; the officers observed firsthand the defendant's own suspicious conduct just prior to the stop. Lockery's information was corroborated by police investigation of the defendant, Lockery implicated himself in criminal activity and was well-known to the police as a person involved in the drug trade. See *State* v. *Tulli*, 14 Conn. App. 356, 359, 541 A.2d 515 (discussing factors useful in evaluating reliability of informant's tip), cert. denied, 208 Conn. 809, 545 A.2d 1105 (1988). The fact that Lockery was not anonymous,

but in police custody, also supported a finding of reliability. See *State* v. *Johnson*, 286 Conn. 427, 438, 944 A.2d 297 (2008). It is also noteworthy that Lockery was face to face with the police and that he claimed to have had prior drug dealings with the defendant. See id. Further, Lockery provided information concerning the defendant that he garnered through a telephone conversation that occurred in the presence of one or more police officers. Thus, the police had a basis to believe that Lockery was passing on firsthand information to them, and they had a reasonable and articulable suspicion sufficient to detain the defendant. See id.; *State* v. *Orellana*, 89 Conn. App. 71, 82, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005).

B

We next turn to the defendant's claim that the court improperly denied the motion to suppress insofar as it related to the search of his residence.

The court found that shortly after detaining and arresting the defendant, Chrostowski and New Britain police Sergeant William Steck went to the defendant's residence, which was nearby. Upon knocking at the door to the defendant's apartment, the officers spoke with Gross. They informed Gross that the defendant had been arrested and that the police were in the process of obtaining a warrant to search the residence. "The police then conducted what they described as a protective sweep of the apartment, lasting less than two minutes, and they observed in plain view in the apartment on top of a dresser in the bedroom a packet of heroin, which bore the same logo, two smiling faces . . . as the narcotics that were taken from [the defendant] . . . . ." The parties disagreed over the constitutional propriety of this entry, but the court concluded that it did not need to resolve that issue in ruling on the motion to suppress.

The officers subsequently conducted a search of the residence pursuant to a warrant. The court concluded that regardless of whether the initial search of the residence was proper, the subsequent search of the apartment and seizure of items from the apartment pursuant to a warrant was valid under the independent source doctrine.[11] The court concluded that the warrant was supported by probable cause derived from sources that were independent of anything observed by the police during the initial entry. Thus, the court concluded that probable cause existed in the search warrant application without considering the information in the application related to the initial entry. The court also concluded that the decision to apply for the warrant was unrelated to any information learned by police during the initial entry. The court found that "the decision to get the warrant was not prompted by the observation of the drugs in any way, shape or form . . . [a]nd there is no basis to conclude that the police were not going to get the warrant [before they initially entered the residence].

We carefully have reviewed the claim briefed by the defendant. He argues that his right against unreasonable search and seizure was violated by the initial entry and

---

[11] "It is well recognized that the exclusionary rule has no application [where] the [g]overnment learned of the evidence from an independent source. . . . Independent source, in the exclusionary rule context, means that the tainted evidence was obtained, in fact, by a search untainted by illegal police activity. . . . The doctrine is based on the premise that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred. . . . In the case of a search conducted pursuant to a search warrant, [t]he two elements that must be satisfied to allow admission [under the independent source doctrine] are: (1) the warrant must be supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Joyce*, 243 Conn. 282, 289–90, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998).

search of his apartment by Chrostowski and Steck. He argues that this entry and search occurred without consent or probable cause and was not justified in law. He also posits that as a result of this initial search, "[the] police found the drugs that led to the issuance of [the] search warrant," and, thus, the contraband found in the apartment should have been suppressed as the fruit of police illegality.

As set forth previously, the court assumed for purposes of its analysis that the initial search of the apartment was illegal and determined, in fact and law, that the contraband seized pursuant to a warrant was untainted by any illegality related to the earlier search. The defendant does not challenge the court's thorough analysis under the independent source doctrine but, instead, focuses exclusively on the legality of the initial search. We need not review the issue raised because in light of the court's analysis, it is irrelevant to the judgment from which the defendant appeals. See, e.g., *Ingels* v. *Saldana*, 103 Conn. App. 724, 728–29, 930 A.2d 774 (2007). Even were we to agree that the initial search was illegal, our determination would be of no benefit to the defendant. He has not challenged the basis of the court's judgment, and, thus, we do not have occasion to review the actual basis on which the court's judgment rests. See *State* v. *Dalzell*, 282 Conn. 709, 715, 924 A.2d 809 (2007) (appellate court may not decide appeal on ground parties have neither raised nor briefed).

The judgments are affirmed.

In this opinion the other judges concurred.