******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MIGUEL A. VEGA
(AC 40082)

Lavine, Alvord and Bear, Js.

*Syllabus*

Convicted of the crimes of murder, home invasion, burglary in the first degree, attempt to commit murder, attempt to commit assault in the first degree and carrying a pistol without a permit, the defendant appealed. The defendant and another man had broken into the apartment of E after E and several of his friends, including P and K, returned to the apartment from a bar where the defendant had punched E and fought with P. The defendant fatally shot P and, when E fled the apartment, chased after him onto the streets where E was shot. A police officer who had arrived at the scene overheard K, who was emotional and upset, speaking on a phone, during which she referred to the defendant by his nickname and stated that the defendant was one of the shooters. The officer questioned K after the phone call, and K again identified the defendant as one of the shooters. E told another police officer who rode with E in an ambulance to a hospital that he had been at the bar with the person who shot him, whom E identified as "Mike." The defendant's first trial ended in a hung jury. Prior to the start of the defendant's second trial, E wrote in a letter that was delivered to the trial court that he did not want to testify and had been pressured by the police to point out the defendant as the person who had shot him. The trial court excluded the letter from evidence, ruling that the statements in it were not against E's penal interest under the applicable provision (§ 8-6 [4]) of the Connecticut Code of Evidence. The trial court admitted into evidence the statements made by K and E under the spontaneous utterance exception to the hearsay rule in the applicable provision (§ 8-3 [2]) of the Connecticut Code of Evidence. *Held*:

1. The trial court did not abuse its discretion in admitting into evidence as spontaneous utterances under § 8-3 (2) certain statements made by K and E: the record supported the court's finding that the statements the police officer overheard K make during her phone conversation and that she made to the officer after that conversation occurred under circumstances that negated the opportunity for deliberation and fabrication, as K made the statements on the phone and to the officer while she was near the scene of the home invasion, gunfire and shooting, and within fifteen to thirty minutes after the shooting occurred, she was crying and experiencing stress and shock as a result of the incident at the apartment, there was no evidence that she had spoken to anyone else prior to making the phone call, and the fact that her statements to the officer were given in response to his questions was not significant, given the circumstances under which the statements were made; moreover, E's statements to the police were made within an hour after he ran from the apartment and while he was in shock or under great stress and struggling to survive after having been shot.

2. The trial court properly sustained the state's objection to the admission of E's letter into evidence, as the statements in the letter were not admissible under § 8-6 (4) because they were not against E's penal interest, as claimed by the defendant; the statements in the letter were in the nature of a recantation of E's testimony in the defendant's first trial and seemingly were not intended as an admission by E of perjury, as the letter accused the police of pressuring and threatening E, and stated that E did not know who the offender was and had not seen the offender's face.

3. The defendant could not prevail on his unpreserved claim that the trial court violated his constitutional right to confrontation when it admitted into evidence the statements that the police officer overheard K make during her phone conversation and the statements that K made to the officer after the phone conversation: although the statements that K made during her phone conversation were not testimonial in nature, as they were not made directly to the officer or in response to his questions, there was no evidence that she intended for him to hear the statements,

which were made to a private person while she was under the stress of the incident at the apartment and were not the type of statements that a declarant would expect to be used in a later prosecution, and the admission of the statements that K made directly to the officer, which were testimonial in nature, violated the defendant's right to confrontation because the defendant had no prior opportunity to cross-examine K regarding those statements; nevertheless, the admission of those statements was harmless beyond a reasonable doubt, as the state had presented sufficient independent evidence for the jury reasonably to identify the defendant as the shooter of P and one of the shooters of E.

Argued December 4, 2017—officially released May 1, 2018

*Procedural History*

Substitute information charging the defendant with the crimes of murder, felony murder, home invasion, burglary in the first degree, attempt to commit murder, attempt to commit assault in the first degree and carrying a pistol without a permit, brought to the Superior Court in the judicial district of New London, geographical area number ten, and tried to the jury before *Jongbloed, J.*; verdict and judgment of guilty; thereafter, the court vacated the verdict as to the charge of felony murder, and the defendant appealed. *Affirmed.*

*Lisa A. Steele*, assigned counsel, for the appellant (defendant).

*Michael L. Regan*, state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Miguel A. Vega, appeals from the judgment of conviction, rendered after a jury trial, of the following six offenses: (1) murder in violation of General Statutes § 53a-54a (a); (2) home invasion in violation of General Statutes § 53a-100aa (a) (2); (3) burglary in the first degree in violation of General Statutes § 53a-101 (a) (3); (4) attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a; (5) attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53-59 (a) (5); and (6) carrying a pistol without a permit in violation of General Statutes § 29-35 (a). On appeal, the defendant claims that the trial court (1) abused its discretion by admitting out-of-court statements as spontaneous utterances pursuant to § 8-3 (2) of the Connecticut Code of Evidence; (2) abused its discretion by excluding a letter that contained statements that were against the author's penal interest; and (3) improperly admitted hearsay statements from an unavailable witness in violation of his sixth and fourteenth amendment right to confrontation. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. On the night of March 2, 2010, a group of people gathered in an apartment located at 53 Prest Street in New London, a second floor apartment that belonged to Michael Ellis, Sr. (Ellis, Sr.), who resided there with Lisa DeMusis (L. DeMusis), Nicholas DeMusis (N. DeMusis), Michael Ellis, Jr. (Ellis), and Altareika Parrish. On March 2, present in the apartment in addition to those who resided there, were Rahmel Perry, Shariymah James, Alice Phillips, Jessica Winslow and Keyireh Kirkwood.

Between midnight and 12:30 a.m. on the morning of March 3, 2010, Ellis, Perry, James, Phillips, Winslow, and Kirkwood left the apartment and went to a bar in New London called The Galley. While at the bar, Krystal Taylor and Tamika "Missy" Guilbert joined the group. Also present at the bar were the defendant and a few of his associates. Shortly after Ellis arrived at the bar, he was standing next to Kirkwood. Kirkwood and the defendant have a child together, but she is also a friend of Ellis and many of his associates. Soon after Ellis began standing next to Kirkwood, the defendant motioned toward Ellis to direct him to step away from Kirkwood. When Ellis did not move away from Kirkwood, the defendant approached Ellis and punched him in the face. A fight then broke out in the bar between the two groups, during which Perry began punching and kicking the defendant. That fight was broken up and both groups exited the bar. The defendant was undoubtedly on the losing end of the fight. Outside of the bar, another altercation ensued between the two

groups, which was quickly broken up.

After both groups left the bar, Ellis, Perry, Parrish, Taylor, Kirkwood, Phillips, James, and Guilbert returned to the Prest Street apartment at approximately 1:30 a.m. Ellis, Sr., L. DeMusis, N. DeMusis, and Shauntay Ellis were also present at the apartment when the group returned from the bar. At approximately 2 a.m., the group heard a commotion at the back door, through which two men entered the apartment. They were armed, one with a revolver and the other with an automatic or semiautomatic handgun. Both men were dressed in all black clothing and had their heads and faces covered.

The defendant, who was the first intruder into the apartment, proceeded directly to the living room where Ellis and Perry were located. He pulled down his mask and ordered everyone in the room to get on the floor. Ellis and Taylor were standing close to a window in the living room. Upon hearing the men enter the apartment, Taylor jumped out the window. The defendant then fired toward the window, in Ellis' direction, but did not hit Ellis. He then fired two shots at Perry, who was on the couch. Both shots struck Perry.

Meanwhile, Ellis ran out of the living room and toward the back door where the men had entered. He briefly scuffled with the second intruder, who appeared to reach for a gun. As Ellis was running down the stairs, a shot was fired at him, but did not hit him. Ellis proceeded to run from Prest Street to Blackhall Court. The intruders left the apartment and chased Ellis, firing approximately four shots. Ellis was struck twice, once in the thigh and once in the back. Ellis proceeded to run onto Blackhall Street where he called 911. While he was on Blackhall Street, Ellis flagged down a police officer, Justin Clachrie, who was en route to the apartment at 53 Prest Street. Within minutes, an emergency medical services vehicle arrived and transported Ellis to Lawrence + Memorial Hospital (hospital).

At the apartment, Phillips called 911 and stated that Perry had been shot. Those who remained at the apartment then carried Perry to Shauntay Ellis' vehicle. Shauntay Ellis and Phillips drove Perry to the hospital in Shauntay Ellis' vehicle. Perry was unconscious when he arrived at the hospital, and medical personnel made efforts to resuscitate him. Those efforts were unsuccessful, however, and Perry was pronounced dead. An autopsy revealed that a gunshot wound caused Perry's death, and the medical examiner ruled his death a homicide. Although Ellis' injuries were life-threatening, medical personnel were able to stabilize him in the emergency department. He remained in the hospital for approximately one week and then was released.

After the police arrived at the Prest Street apartment, several people who were present during the shooting

identified the defendant as one of the shooters. The police also learned of the fight between the defendant, Ellis, and Perry that had occurred at the bar earlier on March 3. As a result, various law enforcement agencies immediately made attempts to locate the defendant, and the police obtained a warrant for his arrest. The defendant was finally located approximately three and one-half months later on June 21, 2010, in Gwinnett County, Georgia.

In July, 2010, Detective Sergeant George Potts and Detective Richard Curcuro travelled to Gwinnett County to speak with the defendant about the events that had occurred on March 3, 2010. During this interview, the defendant conceded that he was involved in a fight with Ellis and Perry at the bar, but denied that he was involved in the subsequent occurrence at the Prest Street apartment, on Blackhall Court, and on Blackhall Street. The defendant gave the detectives an alibi, which the investigators were not able to verify. When asked why he fled from Connecticut, the defendant answered that he saw his photograph on the news and was concerned that if he were found in Connecticut, he would be arrested for a parole violation that had occurred in New York.

On January 29, 2015, the defendant was charged by way of an amended information with the following eight offenses: (1) murder in violation of § 53a-54a (a); (2) felony murder in violation of General Statutes § 53a-54c; (3) home invasion in violation of § 53a-100aa (a) (1); (4) home invasion in violation of § 53a-100aa (a) (2); (5) burglary in the first degree in violation of § 53a-101 (a) (3); (6) attempt to commit murder in violation of §§ 53a-49 (a) (2) and 53a-54a (a); (7) attempt to commit assault in the first degree in violation of §§ 53a-49 (a) (2) and 53a-59 (a) (5); and (8) carrying a pistol without a permit in violation of § 29-35 (a). A trial commenced in January, 2015 and continued into February, 2015. The trial ended in a hung jury and the court declared a mistrial.

In January, 2016, a second trial commenced. In a substitute information, the defendant was charged with the following offenses: (1) murder in violation of § 53a-54a (a); (2) felony murder in violation of § 53a-54c; (3) home invasion in violation of § 53a-100aa (a) (2); (4) burglary in the first degree in violation of § 53a-101 (a) (3); (5) attempt to commit murder in violation of §§ 53s-49 (a) (2) and 53a-54a; (6) attempt to commit assault in the first degree in violation of §§ 53a-49 (a) (2) and 53-59 (a) (5); and (7) carrying a pistol without a permit in violation of § 29-35 (a). The jury found the defendant guilty of all of those offenses.[1] The court sentenced the defendant to a total effective term of seventy-five years of imprisonment. This appeal followed. Additional facts will be set forth as necessary.

I

EVIDENTIARY CLAIMS

We first address the defendant's evidentiary claims. On appeal, the defendant argues that the court abused its discretion in admitting into evidence certain out-of-court statements as spontaneous utterances pursuant to § 8-3 (2) of the Connecticut Code of Evidence. Additionally, the defendant argues that the court abused its discretion in excluding a letter that Ellis allegedly wrote and delivered to the court regarding his refusal to testify at the second trial, which the defendant argues contained statements against Ellis' penal interest under § 8-6 (4) of the Connecticut Code of Evidence. We disagree.

We begin by setting forth the relevant standard of review. "As a general rule, hearsay is inadmissible unless an exception from the Code of Evidence, the General Statutes or the rules of practice applies." *State* v. *Miller*, 121 Conn. App. 775, 779, 998 A.2d 170, cert. denied, 298 Conn. 902, 3 A.3d 72 (2010). "To the extent a trial court's admission of evidence is based on an interpretation of the [Connecticut] Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. They require determinations about which reasonable minds may not differ; there is no judgment call by the trial court . . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Internal quotation marks omitted.) Id., 780.

A

Statements Admitted as Spontaneous Utterances

The defendant argues that the court abused its discretion in admitting the following statements as spontaneous utterances: (1) statements that Kirkwood made during a telephone call that Officer Charles Flynn overheard, identifying the defendant as one of the shooters; (2) statements that Kirkwood directly made to Flynn that were introduced through Taylor, identifying the defendant as one of the shooters; and (3) statements that Ellis made on Blackhall Street, in the ambulance, and at the hospital to Clachrie, a responding officer, identifying the defendant as one of the shooters. The state responds that each statement was properly admitted as a spontaneous utterance. We agree with the state.

Our code of evidence defines a spontaneous utterance as "[a] statement relating to a startling event or condition made while the declarant was under the excitement caused by the event or condition." Conn. Code Evid. § 8-3 (2). "[T]he commentary to § 8-3 (2) provides: The hearsay exception for spontaneous utterances is well established. . . . Although [§] 8-3 (2) states the exception in terms different from that of the case law on which the exception is based . . . the rule

assumes incorporation of the case law principles underlying the exception.

"The event or condition must be sufficiently startling, so as to produce nervous excitement in the declarant and render [the declarant's] utterances spontaneous and unreflective. . . .

"The excited utterance exception is well established. Hearsay statements, otherwise inadmissible, may be admitted into evidence to prove the truth of the matter asserted therein when (1) the declaration follows a startling occurrence, (2) the declaration refers to that occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant. . . .

"The requirement that a spontaneous utterance be made under such circumstances as to [negate] the opportunity for deliberation and fabrication by the declarant . . . does not preclude the admission of statements made after a startling occurrence as long as the statement is made under the stress of that occurrence. . . . While [a] short time between the incident and the statement is important, it is not dispositive. . . .

"Whether an utterance is spontaneous and made under such circumstances that would preclude contrivance and misrepresentation is a preliminary question of fact to be decided by the trial judge. . . . The trial court has broad discretion in making that factual determination, which will not be disturbed on appeal absent an unreasonable exercise of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 373–74, 908 A.2d 506 (2006). Moreover, a statement made in response to a question does not preclude its admission as a spontaneous utterance. Id., 376.

1

Kirkwood's Statements

The following additional facts, which the jury reasonably could have found, and procedural history are relevant to the resolution of this claim. The state presented evidence that following the shooting, everyone who was present in the Prest Street apartment ran outside. Shauntay Ellis and Phillips drove Perry to the hospital, while the others remained outside of the apartment on Prest Street. Flynn was responding to the occurrence when he saw a male running in a direction that was taking him away from Prest Street. Flynn stopped this individual, obtained his identification, and determined that he was not related to the Prest Street shooting. Flynn then arrived at the Prest Street apartment and approached a vehicle that was attempting to leave the crime scene. Inside the vehicle were Taylor, Parrish, Guilbert, and James. Flynn briefly spoke to the individuals in the vehicle and learned that they were heading

to the hospital to check on Perry.

Flynn observed Kirkwood on Prest Street speaking on a telephone to someone she referred to as "[m]om." Flynn walked toward where Kirkwood was standing so he would be able to speak to Kirkwood when she finished her telephone call. While speaking on the telephone, Kirkwood was emotional and visibly upset, and her speech had a staccato sound. During the telephone call, Kirkwood stated that "Mikey shot them" and that he had entered through the back of the apartment. Flynn overheard Kirkwood's exclamations that "Mikey" was one of the shooters.[2] Kirkwood then stated that "the cop [is] here," and, "I'm going to tell them that he did it."

After Kirkwood's telephone call, Flynn began speaking directly to Kirkwood. Although Kirkwood's responses were "more guarded," she was visibly upset while talking to Flynn. During this conversation, Kirkwood reiterated the statements from her telephone call, identifying the defendant as one of the shooters. Taylor had returned to the scene after hearing sirens. Taylor was present for Kirkwood's conversation with Flynn, and overheard her statements identifying the defendant as one of the shooters. On multiple occasions during this conversation, Kirkwood apologized to Taylor.

At the second trial, Flynn testified outside the presence of the jury regarding what he overheard Kirkwood say on the telephone to the person she referred to as "[m]om." The defendant objected, arguing that the statements were not excited utterances because they did not satisfy the fourth factor set out in *Kirby*, that "the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant." (Internal quotation marks omitted.) *State* v. *Kirby*, supra, 280 Conn. 374. Specifically, the defendant argued that the statements Kirkwood made over the telephone were not spontaneous utterances because Kirkwood "wasn't screaming. She wasn't wailing. She wasn't moaning. She was talking to someone; clearly hearsay."

Following the state's proffer, the court found that "the declarant was upset, very excited, very emotional, crying on the phone and had a sort of a staccato-type conversation or outburst, and it sounded to the court as though it does satisfy what's required for a spontaneous or excited utterance . . . ." Flynn then testified before the jury regarding the statements that he overheard Kirkwood make during her telephone call.

Taylor also testified regarding the statements that Kirkwood made directly to Flynn.[3] The defendant objected and again argued that these statements did not fall within the spontaneous utterance exception, and in support of his assertion cited the fact that Flynn was questioning Kirkwood. The court disagreed and allowed Taylor to testify regarding Kirkwood's state-

ments to Flynn under the spontaneous utterance exception.

The defendant argues that the court abused its discretion in admitting Kirkwood's statements as spontaneous utterances under § 8-3 (2) of the Connecticut Code of Evidence. The defendant maintains that several minutes had passed from the time of the shooting to the time of Kirkwood's statements over the telephone and to Flynn, and that as a result, Kirkwood had time to deliberate and think about the statements she was going to make. We disagree that the court abused its discretion in admitting Kirkwood's statements.

We first address the statements that Flynn heard Kirkwood make over the telephone to someone she referred to as "[m]om." The parties did not dispute that the statements were made following a startling occurrence, i.e., the home invasion, the subsequent gunfire, and the shooting of Perry, that the statements referred to the startling occurrence, or that Kirkwood observed the occurrence. Therefore, the court had to determine only whether Kirkwood made the statements "under circumstances that negate the opportunity for deliberation and fabrication . . . ." (Internal quotation marks omitted.) *State* v. *Kirby*, supra, 280 Conn. 374.

We conclude that the court did not abuse its discretion in admitting the statements that Kirkwood made over the telephone as spontaneous utterances. The fact that Kirkwood was crying and had a "staccato-type conversation or outburst" supports the court's finding that Kirkwood was still experiencing stress and shock as a result of the occurrence. Although several minutes had passed between the startling occurrence and when Flynn heard Kirkwood make these statements, our Supreme Court has held that "[w]hile [a] short time between the incident and the statement is important, *it is not dispositive*." (Emphasis added; internal quotation marks omitted.) *State* v. *Kirby*, supra, 280 Conn. 374; see also *State* v. *Stange*, 212 Conn. 612, 618, 563 A.2d 681 (1989) ("A majority of jurisdictions that have addressed the issue of the effect of the time interval between the startling occurrence and the making of the spontaneous utterance have recognized that an acceptable time interval cannot be specified. Each case must be decided on its particular circumstances."). In *Stange*, the trial court admitted statements that the declarant made "approximately fifteen to thirty minutes after a [startling occurrence." Id., 620.

Our Supreme Court's decision in *State* v. *Slater*, 285 Conn. 162, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008), informs our analysis of this issue. In *Slater*, two bystanders heard the victim screaming and crying while on the street that someone had tried to rape her. Id., 166. The victim, while in a "disoriented and hysterical state," told the bystanders "that a black male with a big knife had raped

her." (Internal quotation marks omitted.) Id. The two bystanders testified regarding the victim's statements to them. Id., 168.

On appeal, our Supreme Court held that "the first three requirements [for a spontaneous utterance] undoubtedly were satisfied." Id., 179. The court concluded that the trial court had not abused its discretion in admitting the statements as spontaneous utterances because "[w]ith respect to the fourth factor, although the amount of time that lapsed between the incident and [the victim's] statement is unclear, the victim still visibly was shaken and appeared to be making the statement as a cry for help. . . . The victim's emotional state, therefore, indicates that her statement was made under circumstances that had negated the opportunity for deliberation or fabrication." (Citations omitted; internal quotation marks omitted.) Id., 179–80.

Here, as in *Slater*, there is no doubt that the first three requirements for a spontaneous utterance were established. Additionally, when Kirkwood made the statements, she was visibly upset, crying, and speaking with a "staccato-type conversation or outburst . . . ." Despite the fact that approximately fifteen to thirty minutes had passed from the time of the startling occurrence to the time Kirkwood made the statements over the telephone, Kirkwood's emotional state at the time she made those statements demonstrated that she was still experiencing shock or stress because of the home invasion, gunfire, and shooting that had just occurred in the Prest Street apartment.

The defendant relies on this court's decision in *State v. Gregory C.*, 94 Conn. App. 759, 893 A.2d 912 (2006), to support his position that the court abused its discretion in admitting the statements that Kirkwood made over the telephone. In *Gregory C.*, the trial court admitted a rape victim's hearsay statements as spontaneous utterances. Id., 770. The statements were introduced through a police officer, who had interviewed the defendant the day after the rape had occurred. Id., 769–70. Between the time of the rape and the time that the victim made the statements to the police officer, the victim contacted a friend to "talk to her about the defendant." Id., 762. The victim and her friend then went to a courthouse so the victim could obtain a restraining order against the defendant. Id., 769. After that, at approximately 2 p.m. on the day following the rape, the victim went to the police station and detailed to the officer the facts surrounding the rape. Id., 769–70.

At trial, the state asked the interviewing police officer what the victim specifically told him about the rape that occurred the night before. Id., 770. The court overruled the defendant's objection and allowed the officer to testify regarding the victim's statements under the spontaneous utterance exception. Id. On appeal, this court concluded that the trial court abused its discretion

in admitting the victim's statements to the police officer as spontaneous utterances. Id., 772. In so doing, this court stated that "more than fifteen hours had passed between the time of the alleged sexual assault and the victim's statement to [the police officer]. Further, the victim discussed her alleged assault at length with [her friend] prior to giving her statement. The victim thus had considerable time and opportunity to collect her thoughts and reflect on what had occurred the night before." Id., 771–72.

The present case is distinguishable from *Gregory C.* Here, the evidence established that, at most, fifteen to thirty minutes passed between the time of the startling occurrence and the time Flynn overheard Kirkwood make the statements. Also, there was no evidence in the record that Kirkwood had spoken to anyone else prior to making the telephone call to the person she referred to as "[m]om," unlike in *Gregory C.*, where the victim called her friend following her rape, and then fifteen hours later spoke to a police officer. *State* v. *Gregory C.*, supra, 94 Conn. App. 762, 769–70. Here, on the other hand, a short time after the shooting, Kirkwood made a telephone call to "[m]om" and Flynn overheard the statements that she made during that telephone call. Accordingly, the defendant's reliance on *Gregory C.* is misplaced. We conclude that the court did not abuse its discretion in admitting the statements that Kirkwood made over the telephone as spontaneous or excited utterances pursuant to § 8-3 (2) of the Connecticut Code of Evidence.

We next address the statements that Kirkwood directly made to Flynn, which Taylor overheard. As with the statements that Kirkwood made over the telephone, the defendant's sole evidentiary challenge to the admission of Kirkwood's statements to Flynn revolves around whether Kirkwood made the statements "under circumstances that negate the opportunity for deliberation and fabrication . . . ." (Internal quotation marks omitted.) *State* v. *Kirby*, supra, 280 Conn. 374. Specifically, the defendant argues that because of the amount of time that had elapsed, and because the statements were made during an "interview," the court abused its discretion in admitting the statements as spontaneous utterances. Although this issue presents a closer question as to whether the statements fall within the spontaneous utterance exception, we conclude that the court did not abuse its discretion in admitting these statements as spontaneous utterances.

On the basis of the evidence presented, it was reasonable for the court to conclude that the statements that Kirkwood made directly to Flynn were spontaneous utterances. Taylor's testimony outside the presence of the jury established that Kirkwood was crying and screaming when she made the statements to Flynn. The court reasoned that "according to the testimony,

[Kirkwood's] demeanor as described by [Taylor] was that [Kirkwood] was crying and screaming, and although [Taylor] said while not at the top of [Kirkwood's] lungs, [Kirkwood] certainly was crying and screaming, clearly shocked and distressed, having just minutes before witnessed a traumatic break-in and multiple shooting."

This court's decision in *State* v. *Guess*, 44 Conn. App. 790, 692 A.2d 849 (1997), aff'd, 244 Conn. 761, 715 A.2d 643 (1998), guides our resolution of this issue. In *Guess*, the declarant was the passenger in a vehicle that was shot at, resulting in the death of the driver. Id., 793. About fifteen or thirty minutes after the startling occurrence, the declarant spoke with a police officer. Id., 802. The conversation with the officer lasted for a period of about fifteen minutes. Id. The police officer testified that the declarant was "very shaken up and nervous during the conversation and was spontaneously just muttering out things because he was so wound up." (Internal quotation marks omitted.) Id. The declarant provided the officer with details of the occurrence, during which time he identified the defendant as the shooter. Id., 802–804. The trial court admitted the declarant's statements as spontaneous utterances. Id., 802.

On appeal, this court concluded that the trial court did not abuse its discretion in admitting the declarant's statements pursuant to the spontaneous utterance exception. Id., 805. In reaching this conclusion, this court cited the trial court's reasoning for admitting the statements, which included the following facts: that the declarant had witnessed a shooting; the time gap between the shooting and the statements was, at most, one hour; the declarant was visibly upset, nervous, and shaken up; the declarant answered the officer's questions directly, but also provided additional information spontaneously, which was not elicited; and the declarant was still at the scene of the occurrence when he made the statements to the officer. See id., 804. The trial court also noted that "the fact that the information was given in response to questions, under these circumstances . . . is not significant." (Internal quotation marks omitted.) Id. This court held that "[t]he trial court properly applied the law concerning spontaneous utterances to the facts of the case and properly ruled that the testimony was admissible under the hearsay exception." Id., 805.

In the present case, Kirkwood made the statements to Flynn between fifteen and thirty minutes after witnessing the occurrence. The evidence established that Kirkwood was visibly upset, crying, and screaming. Taylor also testified that Kirkwood "kept telling me she was sorry." There is no evidence in the record that either Flynn or Taylor elicited Kirkwood's apologies to Taylor. Furthermore, Kirkwood made the statements

to Flynn while near the scene of the home invasion, gunfire, and shooting, within minutes after it had occurred. The fact that Kirkwood's responses were given in response to Flynn's questions is not significant given the circumstances described in the preceding paragraphs. See also *State* v. *Kirby*, supra, 280 Conn. 376 ("that a statement is made in response to a question does not preclude its admission as a spontaneous utterance"). Accordingly, we conclude that the court did not abuse its discretion in admitting the statements that Kirkwood directly made to Flynn under the spontaneous utterance exception to the hearsay rule.

### 2

### Ellis' Statements

The following additional facts are relevant to our resolution of this claim. The state presented evidence that in the midst of the events at the Prest Street apartment, Ellis ran out the back door of the apartment, ran up Prest Street, then to Blackhall Court, and stopped when he reached Blackhall Street. While Ellis was running from the apartment, he was shot at four times, and hit twice. When Ellis stopped on Blackhall Street, he called 911. Within minutes, Clachrie arrived on Blackhall Street and Ellis flagged him down. Clachrie pulled over and Ellis approached his police cruiser, collapsing on the hood.

Clachrie exited his vehicle and began speaking to Ellis. During this time, Ellis was moaning and yelling in pain, and told Clachrie that he had been shot. Clachrie lifted Ellis' shirt and confirmed that he had been shot. Clachrie asked Ellis if he knew who had shot him. Ellis responded in the negative, but stated "that it was a Puerto Rican male in black." Ellis also indicated that the shooting occurred at a house on Prest Street.

Within minutes of Clachrie's arrival, medical personnel arrived and began treating Ellis' injuries and preparing to transport Ellis to the hospital. At this time, Ellis continued to scream and yell in pain. He vomited while being treated on Blackhall Street and vomited again once he was inside the ambulance. Clachrie was in the ambulance with Ellis and attempted to ask him more questions about the shooting. Because Clachrie could smell alcohol on Ellis' breath, Clachrie asked Ellis whether he had been at a bar. Ellis responded that he had been at The Galley earlier in the night. When Clachrie asked Ellis whether the person who shot him had also been at the bar, Ellis responded in the affirmative.

It took approximately two minutes for the ambulance to transport Ellis from Blackhall Street to the hospital. When Ellis arrived at the hospital, he continued to scream and yell in pain. Within minutes, Clachrie was able to ask Ellis questions, and asked whether Ellis knew who shot him. Ellis responded that "Mike" had shot him. By this time, Clachrie had learned that the

defendant was a suspect, so he asked Ellis if the individual who had shot him had a baby with Kirkwood. Ellis responded to that question by nodding his head up and down, as if answering the question in the affirmative. Soon after, Ellis was moved to the intensive care unit, and Clachrie was unable to continue questioning him.

At trial, the defendant objected on hearsay grounds to the admission of the statements that Ellis made to Clachrie. The defendant argued that the statements did not fall within the spontaneous utterance exception because Ellis had time to think about his responses to Clachrie's questions, and therefore, Ellis had time to deliberate and fabricate his statements. The trial court disagreed and admitted the statements under the spontaneous utterance exception. In so doing, the court reasoned that the statement "was made initially very close in time to the call from dispatch, [Clachrie] testified [that the statement was made] a very short distance away from the area. [Clachrie] responded immediately, and the events transpired very quickly thereafter. So, under the circumstances, [the] objection is overruled, and the evidence may be admitted."

The defendant argues that the court abused its discretion by admitting Ellis' statements to Clachrie on Blackhall Street, in the ambulance, and at the hospital. The defendant argues that because Ellis initially told Clachrie that a "Puerto Rican male in black" had shot him, and then later identified the defendant as the shooter, he had time for deliberation and fabrication, and therefore the statement was not a spontaneous utterance. We disagree.

Our Supreme Court's decision in *State* v. *Kelly*, 256 Conn. 23, 770 A.2d 908 (2001), informs our resolution of this issue. In *Kelly*, a teenage girl was sexually assaulted by the defendant after he had offered to give her a ride home. Id., 28. The assault occurred near the victim's home, and the victim arrived home, visibly upset, shortly after the assault. Id., 28–29. The victim told her father that she was upset because she had gotten into a fight with one of her friends. Id., 29. The victim's sister then attempted to speak with her, but the victim was reluctant to tell her sister about the assault. Id. While the victim's sister attempted to speak to the victim, the victim was on the floor in the fetal position and appeared frightened. Id., 41. The victim finally told her sister about the assault, but made her promise not to tell anyone. Id., 29. The victim told her parents of the assault later in the evening, and went to a hospital and to the police the following day. Id. The court admitted the victim's statements to her sister as spontaneous utterances. Id., 41.

On appeal, the defendant challenged the admission of the victim's statements to her sister, arguing that the statements did not fall within the spontaneous utterance exception. Id., 40. Specifically, the defendant

argued that because the victim initially lied to her father about why she was upset, and because she was reluctant to tell her sister what happened, the victim had time for reasoned reflection and fabrication of the information she provided to her sister. Id., 42–43. Our Supreme Court concluded that the defendant's argument was "without merit." Id., 43. In so concluding, the court stated that "[o]nly a period of approximately ten to fifteen minutes passed between the startling occurrence . . . and the victim's disclosures to her sister. The victim remained in an emotionally distressed state throughout that time period. The trial court reasonably concluded that the victim's behavior comported with that of an individual reacting to a severely emotional, startling event without the time or wherewithal to fabricate it." Id.

In the present case, Ellis' statements to Clachrie on Blackhall Street, in the ambulance, and at the hospital were made while Ellis was in shock from or under the great stress from having been shot twice; he manifested this by continuing to yell and moan because of the pain he was experiencing.[4] Furthermore, all of his statements were made within one hour of his running from the apartment after being confronted and shot at by the defendant; being shot at several additional times outside of the apartment; being struck twice by bullets; and while he was struggling to survive. Taking all of the facts surrounding the statements into consideration, we conclude that the court did not abuse its discretion in admitting Ellis' statements to Clachrie under the spontaneous utterance exception to the hearsay rule.

### B

### Ellis' Letter

The defendant's final evidentiary claim revolves around a letter that Ellis allegedly wrote and delivered to the court clerk prior to the start of the second trial, in which it was stated that he did not want to testify at the second trial and that he had been pressured to point out the defendant as the person who had shot him. The defendant argues that the court abused its discretion in excluding the letter from evidence because the letter contained statements against Ellis' penal interest under § 8-6 (4) of the Connecticut Code of Evidence. The state responds that the court properly excluded the letter, as there is no indication that Ellis was aware of whether he was subjecting himself to criminal punishment when making the statements in the letter, and therefore the statements are not against Ellis' penal interest. We agree with the state.

The following procedural history is relevant to the resolution of this claim. Just prior to the start of the second trial in January, 2016, the state informed the court that Ellis was refusing to testify. The court noted that the state had properly served Ellis with a subpoena

and that the subpoena contained a notice that if Ellis did not appear in court on the date and time stated, the court could order his arrest. The court issued a capias pursuant to General Statutes § 54-2a and set bond in the amount of $100,000.

During the trial, the state informed the court that Ellis maintained his refusal to testify. The court allowed Ellis' testimony from the first trial and probable cause hearing to be read into the record, and provided the jury with redacted transcripts of that former testimony. In response, the defendant offered a letter that Ellis "purportedly handed to madam clerk" on January 5, 2016, in which he stated, inter alia, that "I have also been pressured to point out a specific individual, the defendant, Miguel Vega, in which, I state and have stated I did not actually know who the offender was. In the heat of the incidence, in which, I was attacked and was in the midst of running to safety in order to contact authorities. I did not in fact see the offender's face." (Internal quotation marks omitted.) Ellis also allegedly wrote that "I am reaching out in efforts to express my feelings and concerns that my well-being, safety, and cooperation has not been taken into account by the police department, [the] State of Connecticut, [or] the Superior Courts. I am in fear of my life and the lives of my family."

Defense counsel argued that the letter should be admitted as a statement against penal interest under § 8-6 (4) of the Connecticut Code of Evidence. Defense counsel reasoned that the statement was against Ellis' penal interest because "he told [the court] this morning that in the face of criminal contempt, penalties of incarceration and fines, he still was not going to testify. So, this is evidence of his . . . penal intent, if you will, against his penal [interest]." The state objected, arguing that "although [the letter] was submitted in the belief that it would help him in his quest not to testify here," none of the statements in the letter were against Ellis' penal interest. The state specified that it did not believe that Ellis "felt that this statement was going to be against his penal interest when he made it," or that "he felt that he was [going to] incur any liability."

The court sustained the state's objection to the letter, concluding that the statements contained in the letter were not against Ellis' penal interest. The court reasoned that "[a]lthough a refusal to cooperate does in fact implicate . . . a victim's exposure to possible consequences such as contempt, the court does not view the letter as a statement against penal interest. In fact, much of the letter relates to Mr. Ellis' fears for his safety and that of his family as well as his perceived dissatisfaction with the manner in which he was treated. . . . The letter is therefore inadmissible hearsay and the objection is sustained."

On appeal, the defendant argues that the court should

have admitted the letter as a statement against Ellis' penal interest. The defendant argues for the first time[5] that because Ellis previously testified that the defendant was one of the shooters, he knew or should have known that the statement in his letter, in which he maintained that he did not know who shot him, exposed him to a *perjury* charge and was thus against his penal interest. We disagree.

"Section 8-6 of the Connecticut Code of Evidence provides that if the declarant is unavailable as a witness, a statement against penal interest is not excluded by the hearsay rule. Section 8-6 (4) of the Connecticut Code of Evidence defines a statement against penal interest as follows: A trustworthy statement against penal interest that, at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest." (Internal quotation marks omitted.) *State* v. *Diaz*, 109 Conn. App. 519, 544–45, 952 A.2d 124, cert. denied, 289 Conn. 930, 958 A.2d 161 (2008). "In short, the admissibility of a hearsay statement pursuant to § 8-6 (4) of the Connecticut Code of Evidence is subject to a binary inquiry: (1) whether [the] statement . . . was against [the declarant's] penal interest and, if so, (2) whether the statement was sufficiently trustworthy." (Internal quotation marks omitted.) *State* v. *Bonds*, 172 Conn. App. 108, 117, 158 A.3d 826, cert. denied, 326 Conn. 907, 163 A.3d 1206 (2017).

"As to what is against penal interest, quite obviously the essential characteristic is the exposure to risk of punishment for a crime . . . . Moreover, it is not the fact that the declaration is against interest but awareness of that fact by the declarant which gives the statement significance." (Internal quotation marks omitted.) *State* v. *Collins*, 147 Conn. App. 584, 590, 82 A.3d 1208, cert. denied, 311 Conn. 929, 86 A.3d 1057 (2014).

This court's decision in *State* v. *Diaz*, supra, 109 Conn. App. 519, guides our resolution of this claim. In *Diaz*, a witness, who identified the defendant as a drug dealer and testified at the defendant's first trial, wrote a letter in which he stated that he "testified in court against [the defendant] because the police said [he] had no choice and [because] they gave [him] heroin." (Internal quotation marks omitted.) Id., 540. The defendant asserted that the letter was a statement against the declarant's penal interest because the letter revealed that the declarant committed perjury when he

testified at the first trial. Id., 541. The trial court sustained the state's objection and ruled that the letter was inadmissible on several grounds. Id., 543. The trial court concluded, inter alia, that "the letter did not constitute a statement against [the declarant's] penal interest because none of the statements therein tended to subject [the declarant] to criminal liability for any crimes but were in the nature of a recantation of [the declarant's] prior testimony."[6] Id. On appeal, this court concluded that "the court's ruling that the statement did not fall within the hearsay exception relied on by the defendant was legally correct." Id., 548.

The letter at issue in the present case similarly did not include a statement against penal interest.[7] The letter accused Inspector Timothy Pitkin of pressuring Ellis into testifying a certain way. It stated that Pitkin threatened Ellis by telling him that if he did not testify at the defendant's second trial, he would go to prison. Although the letter alleged that Ellis " 'did not actually know who the offender was' " and that he " 'did not see the offender's face,' " these statements are not against Ellis' penal interest, as they, standing alone, provide no indication that Ellis knew or should have known that he was subjecting himself to criminal liability by making those statements. As in *Diaz*, the statements were in the nature of a recantation of Ellis' prior testimony, and seemingly not intended by him as an admission of perjury. Therefore, Ellis' letter did not contain any statements against penal interest pursuant to § 8-6 (4) of the Connecticut Code of Evidence.[8] Accordingly, the court did not abuse its discretion in sustaining the state's objection and excluding the letter from evidence.[9]

II

CONSTITUTIONAL CLAIM

We now turn our analysis to the defendant's constitutional claim. On appeal, the defendant claims that the admission of certain statements violated his sixth and fourteenth amendment right to confrontation. The statements at issue are the statements Kirkwood made over the telephone to someone she referred to as "[m]om" and the statements Kirkwood made directly to Flynn, which Taylor overheard.[10] The state responds that the statements were nontestimonial and that even if the statements were testimonial, any error was harmless beyond a reasonable doubt. We agree with the state.

At trial, the defendant did not argue that the admission of Kirkwood's statements would violate his right to confrontation. The defendant instead focused his objection on the assertion that Kirkwood's statements did not fall within the spontaneous utterance exception. Therefore, before we reach the merits of the defendant's confrontation clause claim, we first must determine whether the issue is properly before this court. On

appeal, the defendant requests that we review his constitutional claim pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

It is well established that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40. "[T]he first two [prongs of *Golding*] involve a determination of whether the claim is reviewable . . . and under those two prongs, [t]he defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error." (Citation omitted; internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 744, 91 A.3d 862 (2014). "[T]he second two [prongs of *Golding*] . . . involve a determination of whether the defendant may prevail." (Internal quotation marks omitted.) *State* v. *Leggett*, 94 Conn. App. 392, 408, 892 A.2d 1000, cert. denied, 278 Conn. 911, 899 A.2d 39 (2006).

We conclude that the defendant's constitutional claim meets the first two prongs of *Golding*. The defendant has provided us with an adequate record upon which to review his alleged constitutional violation, and the defendant's claim is of constitutional magnitude. Although his claim centers on the admission of evidence, it implicates the defendant's sixth and fourteenth amendment right to confrontation of witnesses. Ultimately, however, whether a defendant is entitled to any remedy for a violation of his right to confront witnesses depends on whether the violation is legally harmless. See *State* v. *Campbell*, 328 Conn. 444, 512,      A.3d (2018) ("[i]t is well established that a violation of the defendant's right to confront witnesses is subject to harmless error analysis" [internal quotation marks omitted]); see also *State* v. *Pugh*, 176 Conn. App. 518, 528, 170 A.3d 710 (conducting harmless error analysis to resolve confrontation clause claim), cert. denied, 327 Conn. 985, 175 A.3d 43 (2017). We thus turn our discussion to the third and fourth prongs of *Golding*.

"The [c]onfrontation [c]lause of the [s]ixth [a]mendment provides: In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the

witnesses against him. In *Crawford* v. *Washington*, 541 U.S. 36, 53–54 [124 S. Ct. 1354, 158 L. Ed. 2d 177] (2004), [the United States Supreme Court] held that this provision bars admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination. A critical portion of this holding, and the portion central to [the] resolution of the [present case], is the phrase testimonial statements. Only statements of this sort cause the declarant to be a witness within the meaning of the [c]onfrontation [c]lause. . . . It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the [c]onfrontation [c]lause." (Citation omitted; internal quotation marks omitted.) *Davis* v. *Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

"Although [in *Crawford*] the Supreme Court declined to define the term testimonial, it noted, however, that [w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a formal trial; and to police interrogations. . . . Various formulations of this core class of testimonial statements exist: ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to use prosecutorially . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Azevedo*, 178 Conn. App. 671, 676, 176 A.3d 1196 (2017), cert. denied, 328 Conn. 908, 178 A.3d 390 (2018).

"Accordingly, even though the Supreme Court did not establish a comprehensive definition of testimonial, it is clear that much of the [United States] Supreme Court's and our jurisprudence applying *Crawford* largely has focused on the reasonable expectation of the declarant that, under the circumstances, his or her words later could be used for prosecutorial purposes. . . . [T]his expectation must be *reasonable* under the circumstances and not some subjective or far-fetched, hypothetical expectation that takes the reasoning in *Crawford* and *Davis* [v. *Washington*, supra, 547 U.S. 813] to its logical extreme. (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Azevedo*, supra, 178 Conn. App. 676–77.

"In *Davis* v. *Washington*, supra, 547 U.S. 813, the court articulated the following test for determining whether such statements are testimonial and, therefore, inadmissible under *Crawford* in the absence of a prior opportunity for cross-examination by the defendant: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation

is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (Internal quotation marks omitted.) *State* v. *Kirby*, supra, 280 Conn. 381. The determination of whether a statement is testimonial and thus subject to the admissibility restrictions of *Crawford* is a question of constitutional law that is subject to plenary review. Id., 378.

The relevant facts are discussed in part I A 1 of this opinion. With regard to the statements that Kirkwood made over the telephone, which Flynn overheard, we conclude that those statements are nontestimonial, and therefore, the defendant has failed to satisfy the third prong of *Golding* with respect to those statements. Those statements fall into neither the " 'core class' " of testimonial statements—e.g., prior testimony at a preliminary hearing, grand jury testimony, former trial testimony, or police interrogations—nor one of the " '[v]arious formulations' " of the core class—e.g., affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that the declarant would expect to be used in a later prosecution. *State* v. *Azevedo*, supra, 178 Conn. App. 676.

Kirkwood made the statements over the telephone to someone she referred to as "[m]om." She did not make them directly to Flynn, and the statements were not made in response to Flynn's questions. Flynn did not initiate this conversation with Kirkwood, and there is no evidence that Kirkwood intended for Flynn to hear the statements she was making during her telephone call. Rather, Kirkwood made the statements over the telephone to a private person, not a government agent, while under stress from the incident, including the shooting, which she had witnessed minutes before. Accordingly, the defendant cannot prevail on his unpreserved claim that admission of the statements Kirkwood made over the telephone to "[m]om" violated his right to confrontation.

We conclude, however, that the statements that Kirkwood made directly to Flynn, which Taylor overheard, are testimonial in nature. Because the defendant had no prior opportunity to cross-examine Kirkwood regarding those statements, the admission of those testimonial statements violated the defendant's right to confrontation. See *Crawford* v. *Washington*, 541 U.S. 53–54.

Our Supreme Court's decision in *State* v. *Kirby*, supra, 280 Conn. 361, informs our analysis of this issue. In *Kirby*, the defendant kidnapped and assaulted the victim; the victim, however, escaped and returned to her home. Id., 365. The officer who responded to the victim's home conducted an interview of the victim, in

which she identified the defendant as the perpetrator of the kidnapping and assault, and detailed exactly what had occurred. Id., 366–69. On the following evening, the victim suffered fatal injuries when she fell down a flight of stairs and was thus unavailable for trial. Id., 371. The trial court allowed the responding officer to testify regarding the statements the victim made to him during the interview. Id., 368–69.

On appeal, the defendant argued, inter alia, that admission of the defendant's statements to the responding officer during the interview violated the defendant's right to confrontation. Id., 378. Our Supreme Court agreed, holding that "[t]he facts and circumstances of this case indicate that . . . the officer's questioning was directed not at seeking to determine . . . what is *happening*, but rather what *happened*. Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer should have done." (Emphasis added; internal quotation marks omitted.) Id., 385–86. The court further opined that "any emergency with respect to the complainant had ceased because the alleged crimes no longer were in progress and she was rendered protected by [the responding officer's] presence at her home, which constituted part of the alleged crime scene in this case." Id., 386. Accordingly, because the responding officer was present and the defendant "was located some distance away . . . the primary purpose of [the responding officer's] interaction with the complainant [was] investigatory, and her answers to his questions testimonial statements. . . . [T]he trial court improperly permitted [the responding officer] to testify about the complainant's statements to him."[11] Id., 386–87.

The statements that Kirkwood made directly to Flynn are similarly testimonial in nature. As in *Kirby*, when Flynn was interviewing Kirkwood, his primary purpose was to determine what had *happened*, not what was *happening*. The emergency had ceased; Flynn and other officers were present at the scene, and both shooters had fled the area. Having heard Kirkwood make the statements over the phone in which she identified the defendant, Flynn interviewed Kirkwood as part of his investigation into the crime that had occurred. Accordingly, we conclude that the statements Kirkwood made directly to Flynn were testimonial. Because the defendant never had an opportunity to cross-examine Kirkwood regarding those testimonial statements, their admission violated the defendant's right to confrontation. Therefore, the third prong of *Golding* is satisfied.

The defendant's claim, however, fails under the fourth prong of *Golding*. "It is well established that a violation of the defendant's right to confront witnesses is subject to harmless error analysis . . . ." (Internal

quotation marks omitted.) *State* v. *Pugh*, supra, 176 Conn. App. 530. Although the defendant has established that a constitutional violation exists, we conclude that the state presented sufficient independent evidence to render any error harmless beyond a reasonable doubt. Such independent evidence includes the statements that Flynn overheard Kirkwood make during a phone call, in which she identified the defendant, with whom she had a child, as one of the shooters. Additionally, the jury heard Phillips' 911 call, in which she stated that the defendant had shot Perry. Numerous witnesses who were present at the Prest Street apartment during the occurrence identified the defendant as one of the shooters,[12] and at least two witnesses testified that they heard Kirkwood scream the defendant's name during the occurrence.[13] There was also testimony that the defendant fired the first shot.

In addition, the jury heard numerous witnesses testify that the defendant, Ellis, and Perry were involved in a fight while at the bar and that the defendant was on the losing end of that fight, evidence that could be used to establish a motive for the defendant's subsequent actions. The jury heard testimony that investigators could not find anyone to corroborate the defendant's alibi that he was in a taxi at the time of the occurrence. Moreover, the jury heard testimony that Ellis twice identified the defendant as one of the shooters: once while speaking to Clachrie, and again when shown a photographic array containing the defendant's photograph. The state also presented forensic evidence which established that the same weapons that were fired inside the apartment also were fired outside the apartment and at Ellis as he was running away.

Accordingly, on the basis of the strong identification evidence before the jury, which was separate from the testimonial statements that Taylor overheard Kirkwood make directly to Flynn, we conclude that any error was harmless beyond a reasonable doubt. As the preceding paragraphs demonstrate, the state had presented substantial evidence for the jury reasonably to identify the defendant as the shooter of Perry and one of the shooters of Ellis. Therefore, all four prongs of *Golding* have not been satisfied with respect to this claim. Accordingly, the defendant's unpreserved constitutional claim must fail.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] During the sentencing proceeding, the court vacated the finding of guilt on the felony murder count.

[2] Mikey is a nickname for the defendant.

[3] Flynn did not testify regarding the substance of the statements that Kirkwood made directly to him. Although he testified that he spoke directly to Kirkwood, the state did not ask him about what Kirkwood stated during that conversation. In fact, during Flynn's testimony, the state made clear that it was not going to attempt to introduce through Flynn the statements that Kirkwood made directly to him.

[4] The fact that Ellis initially told Clachrie that the shooter was a "Puerto

Rican male in black" and only later identified the defendant by name and as the father of Kirkwood's child is not necessarily dispositive, as the defendant claims, for purposes of determining whether the court abused its discretion in admitting the utterances. Ellis had been shot twice, was suffering from an extremely painful and life-threatening condition, and was in shock or under the stress of the occurrence when he made to Clachrie the statement in which he identified the defendant as one of the shooters.

[5] For the first time on appeal, the defendant raises the argument that the statements contained in the letter exposed Ellis to *perjury* charges and were thus against his penal interest. At trial, the defendant had argued that it was Ellis' exposure to *contempt* charges that made the statements in his letter against his penal interest. The state argues that the defendant's claim is unpreserved. Although the defendant argued before the court and before this court that the statements contained in the letter were against Ellis' penal interest, he based his argument before the trial court on Ellis' alleged exposure to a charge of criminal contempt, and did not raise in the trial court Ellis' alleged exposure to a charge of perjury. The trial court, therefore, never had the occasion to consider whether Ellis' statements reasonably subjected him to a perjury charge. Because both Ellis' alleged exposure to a charge of criminal contempt, raised solely in the trial court, and Ellis' alleged exposure to a charge of perjury, raised solely in this court, implicate the statement again penal interest hearsay exception, we will address the merits of the defendant's claim.

[6] The trial court in *Diaz* also concluded that the statements contained in the letter were not trustworthy. See *State* v. *Diaz*, supra, 109 Conn. App. 543. Specifically, the court found that the letter was submitted approximately one year following the criminal conduct at issue, and noted that "it did not have any information as to the circumstances surrounding the making of the statement, such as why the declarant made the statement [and] whether [the declarant] wrote [the letter] himself . . . ." Id.

[7] The majority of the letter contained statements that Ellis feared for his safety and the safety of his family. Additionally, Ellis proclaimed that he had been mistreated throughout the first trial and that the state had not taken into account his status as a victim in this case. These statements, which make up the majority of the letter, do not implicate Ellis' penal interest.

[8] Even if we assume arguendo that one or more statements in the letter were against Ellis' penal interest, the letter itself does not provide adequate indicia that the statements contained therein are trustworthy. For example, the statements were made nearly six years after the occurrence. Cf. *State* v. *Lopez*, 254 Conn. 309, 317, 757 A.2d 542 (2000) ("[i]n general, declarations made soon after the crime suggest more reliability than those made after a lapse of time where a declarant has a more ample opportunity for reflection and contrivance" [internal quotation marks omitted]). Moreover, the letter was delivered to the court clerk shortly before the second trial. Cf. *State* v. *Pierre*, 277 Conn. 42, 69–70, 890 A.2d 474 (concluding statements "strongly indicative of their reliability" where "[declarant] made the statements on his own initiative, to an individual who was a friend and someone he routinely socialized with, and not in the coercive atmosphere of [litigation]" [internal quotation marks omitted]), cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006). Additionally, there is nothing in the record demonstrating whether Ellis in fact authored the letter himself and whether it accurately reflected his position, although that seems to have been assumed by the court and the state. See *State* v. *Diaz*, supra, 109 Conn. App. 543.

[9] The defendant argues for the first time on appeal that the court should have admitted the letter pursuant to § 8-9 of the Connecticut Code of Evidence, the residual exception to the hearsay rule. This claim was not raised at trial and is thus not properly preserved. Accordingly, we decline to review it on appeal. See *State* v. *Jorge P.*, 308 Conn. 740, 753, 66 A.3d 869 (2013) ("[t]his court is not bound to consider claims of law not made at the trial" [internal quotation marks omitted]).

[10] The defendant also claimed that the admission of Ellis' statements to Clachrie violated his right to confrontation. In the defendant's reply brief, however, he appears to concede that Ellis' statements to Clachrie do not pose a confrontation clause issue, as he states that "[t]he admission of [Kirkwood's and Ellis'] statements under the guise of spontaneous utterances was an abuse of the trial court's discretion and, *in the case of Kirkwood*, a violation of [the defendant's] confrontation clause rights." (Emphasis added.) Moreover, the admission of Ellis' statements did not raise a confrontation clause issue, as Ellis was twice subject to cross-examination regarding the statements he made to Clachrie.

[11] Because the state did not argue in *Kirby* that admission of the victim's statements was harmless beyond a reasonable doubt, our Supreme Court reversed the judgment of conviction and remanded the case for a new trial. *State* v. *Kirby*, supra, 280 Conn. 387–88.

[12] The witnesses' accounts varied regarding exactly how they recognized the defendant as one of the shooters. It is the job of the jury, however, to determine how much weight to give each item of evidence with which it is presented. See *State* v. *Osbourne*, 138 Conn. App. 518, 533–34, 53 A.3d 284 ("[i]t is axiomatic that it is the jury's role as the sole trier of the facts to weigh the conflicting evidence and to determine the credibility of witnesses" [internal quotation marks omitted]), cert. denied, 307 Conn. 937, 56 A.3d 716 (2012).

[13] Specifically, Shauntay Ellis testified that Kirkwood screamed, "Mikey, stop," and Parrish testified that Kirkwood screamed, "Mikey, why are you doing this . . . ?"

———————————————